**MILLER BOX, INC. and Northport Box, Inc., Plaintiffs-Appellees,**

v.

**UNITED STATES of America, Defendant-Appellant.**

**No. 73–1388.**

United States Court of Appeals, Fifth Circuit.

Jan. 23, 1974.

Rehearing and Rehearing En Banc Denied Feb. 22, 1974.

Scott P. Crampton, Asst. Atty. Gen., Meyer Rothwacks, John Murray, Lynn W. Ross, Jr., Gary R. Allen, Attys., Tax Div., U. S. Dept. of Justice, Washington, D. C., Wayman G. Sherrer, U. S. Atty., William D. Mallard, Jr., Charles D. Stewart, Asst. U. S. Attys., Birmingham, Ala., for defendant-appellant.

Winston B. McCall, Birmingham, Ala., for plaintiffs-appellees.

Before TUTTLE, DYER and MORGAN, Circuit Judges.

TUTTLE, Circuit Judge:

The government appeals from a judgment based upon a jury verdict which determined that salaries totalling $1,143,041 over a two year period paid to the general manager of two box man-

ufacturing *corporations* completely controlled by his brother, in addition to a salary of $24,000 paid to him as manager of a *partnership* box manufacturing company, were reasonable and thus deductible by the corporations as a part of their operating expenses. The government's appeal is based solely upon its contention that the trial court erred in not ordering a directed verdict or entering a judgment n. o. v. in its favor.

The question arises because of the provisions of the Internal Revenue laws. Section 162 of the Internal Revenue Code of 1954 (26 U.S.C.A. § 162) provides:

"A. *Section 162*: *Trade or Business Expenses.*

(a) In General—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

(1) a reasonable allowance for salaries or other compensation for personal services actually rendered;
. . ."

Before discussing the standard to be applied by the trial court in the granting of a judgment n. o. v., as set out by this Court in Boeing Company v. Shipman, 411 F.2d 365 (5 Cir., 1969), we think it necessary to outline a little more precisely the relationships and the history of the corporations and partnership, as well as the persons involved.

In 1948 Garden Miller, Sr., and James Hinton, organized a partnership, which was owned 50 per cent by Miller, 45 per cent by the James Hinton family and 5 per cent by George Hinton (the employee whose salary later raised the litigated issues before the court). The partnership was engaged in the manufacture of wooden boxes and boxes designed to carry ammunition. By late 1965, the war in Viet Nam was increasing, and the business of Miller Box partnership was increasing, and it was "getting more successful in securing contracts and . . . [was] getting bigger and more contracts," and "the outlook in the industry was good." In December 1965 James Hinton entered into a contract with his brother, George Hinton, to become the manager of a box plant that either James or a corporation organized by him would build. The contract called for George to be compensated on the basis of 20 per cent of the net earnings of the plant, before taxes, with no minimum guarantee. At that time George Hinton was the manager of the partnership's plant, earning a salary of $7600. He also owned and operated a farm in the area.

As of March 1, 1966, James Hinton caused Miller Box, Inc. to be formed. He retained 75 shares of the stock totalling 100 shares. Garden Miller, Jr., the son of James' partner, originally owned five shares, which he later disposed of to the company. Thereafter, James Hinton owned 75 shares, George Hinton 5 shares, and Paul W. Bryant, football coach of the University of Alabama, owned 20 shares.[1] A plant had been built and equipped with the necessary machinery for about $100,000, and the taxpayer, Miller Box, Inc., commenced its operations on March 1, 1966. When fully operative it employed about 200 people. George Hinton undertook his duties as general manager of the new corporation, continuing to be general manager of the partnership's plant. In the taxpayer's complaint, in its suit for refund, which is the suit that is now before the court, the taxpayer, Miller Box, Inc., alleged that the salary paid George L. Hinton, Jr. "was paid pursuant to a bona fide contract entered into in *December, 1965*, whereby 20 per cent of net earnings before taxes was to be paid as

---

1. A copy of the minutes of a stockholders' meeting in November 1966 certified that the only stockholders were James Hinton and George Hinton. It is not clear when or how Mr. Bryant became a stockholder. At the November meeting he was given a contract of employment by the corporation at $60,000 per year, primarily to assist in procuring lumber. He was then elected a director.

his compensation." (Emphasis added.) The only contract entered into in December 1965 is Exhibit No. 1, tendered in evidence on behalf of taxpayer. This is the contract mentioned above, which is made not between the taxpayer and George Hinton, but between James Hinton, an individual, and his brother, George, before taxpayer was incorporated.

At the time George Hinton undertook the management of the taxpayer's new plant, Mary Jean Hinton, a sister of James and George, was named "plant manager" (for which she received a salary in fiscal 1967 of $14,200, and in 1968 a salary of $30,000), and Garden Miller, Jr., the son of Miller of the Miller Box Company partnership, was named assistant plant manager under a contract which provided him with a salary that equalled 5 per cent of net profits before taxes and before deduction of George Hinton's salary (Miller's salary under this formula amounted to $49,343 for fiscal 1967).

The new corporation prospered, largely undoubtedly through the efforts of George Hinton and Garden Miller, Jr., and the success of the partnership in obtaining profitable contracts, but the partnership, Miller Box, was obtaining government contracts for the manufacture of ammunition boxes faster than they could be produced by the partnership's plant and Miller Box, Inc.'s new plant. Thereupon James Hinton decided that he would organize an additional corporation to be known as Northport Box, Inc. This corporation was organized to begin business on December 1, 1966, whereupon George Hinton became general manager of that corporation as well. Northport was a *smaller* plant employing "about 130" employees. Again, it is alleged in the claim for refund that he acquired this position with Northport Box, Inc. "pursuant to a bona fide contract entered into in December 1965, whereby 20 per cent of net earnings before taxes was to be paid as his compensation."

Garden Miller, Jr. also assumed a dual role, this time by becoming "plant manager" of Northport Box, Inc. His 5 per cent contract with Northport produced a salary for fiscal 1967 of $71,951, which, when added to the salary that he received while working simultaneously for Miller Box, Inc., equals $121,294.

George Hinton's salary from Miller Box, Inc., the *larger* plant, for the year ending February 28, 1967, amounted to $197,372. His salary from Northport Box, Inc., the *smaller* plant, for the year ending November 30, 1967 amounted to $287,805. His salary from Miller Box, Inc. for the fiscal year ending February 29, 1968 amounted to $657,845. When there is added to this the sum of $24,000, Mr. Hinton's minimum estimates as to the salary he received from the *partnership* for managing its plant as general manager as well, we find that his services were compensated during the two fiscal years involved by payments to him of $1,167,022.

Under his 5 per cent contract, Garden Miller, Jr. received $49,343 from Miller Box, Inc. for fiscal 1967, $71,951 from Northport Box, Inc. for fiscal 1967, and $164,461 from Miller Box, Inc. for fiscal 1968. (This amount was disallowed by the trial court on motion j. n. o. v. apparently because there was *no* proof that Miller performed any specific services for this corporation in 1968).

One essential fact to be constantly borne in mind is that Miller Box Company, the partnership consisting of Garden Miller, Sr. and James Hinton, obtained all of the government contracts for the making of the boxes by the several plants. The partnership ran at full capacity at its own plant; it then allocated to Miller Box, Inc. contracts which enabled it to operate on a two-shift schedule until need for further capacity caused Mr. Hinton to incorporate Northport Box, Inc. Thus, we have the interrelationship of James Hinton and Garden Miller, Sr. obtaining and allocating business to two corporations, which, in turn, paid the compensation here under

attack to the brother of one partner and the son of the other.

The only documentary evidence relating to the several contracts consisted of (1) contract executed in December, 1965 between James Hinton and his brother, George, under the terms of which it was mutually agreed that George would devote his time and energies to the operation of box manufacturing plants to be provided by James either directly or by the organization of a corporation, and that the compensation to be paid to George would amount to 20 per cent of the net profits before taxes; (2) a contract executed on March 28, 1966, between Miller Box, Inc. and Garden Miller, Jr. to run for an indefinite period of time commencing on the date of his contract and continuing thereafter on a month to month basis with no action of either party necessary to the continuation of this employment agreement, the compensation for such services to be 5 per cent of the net profits prior to taxes and prior to the consideration of compensation to be paid to George Hinton, Jr.; (3) minutes of a special meeting of stockholders and directors of Miller Box Company, dated November 18, 1966, authorizing the employment of Paul W. Bryant by Miller Box, Inc. at a salary of $60,000 a year, and electing the said Bryant to the Board of Directors of the corporation; (4) contract dated November 23, 1966, between Miller Box, Inc. and Paul W. Bryant, engaging his services to run until terminated by thirty days notice by either party at $60,000 per year; (5) contract dated December 17, 1966 between Northport Box, Inc. and Garden Miller, Jr. for compensation to be computed at 5 per cent of the net profits before taxes and before compensation paid to George Hinton (it was under this contract of employment that Miller became plant manager of Northport Box, Inc.).

No written contract was introduced showing the employment by either of the two corporations of George Hinton. Neither is there in evidence any assignment of Hinton's contract with his brother, James, entered into on December 15, 1966. There is no evidence in the record as to when the corporations actually made a contractual relationship with George Hinton, other than the fact that he undertook the duties of general manager and was paid a salary based upon the agreed percentage formula. In response to questions by counsel at the trial, Mr. James Hinton testified as follows:

Q. Now, Mr. Hinton, with respect to the contract with Garden Miller and George Hinton, those contracts were taken off by both Northport Box and Miller Box and ratified and transferred— transfer was ratified by the Board of Directors of each corporation?

A. That is correct.

Q. And the corporations assumed the obligations of these parties, and did they assume the obligations to perform for both corporations under those contracts?

A. That is correct.

■ Taxpayers did introduce minutes of a directors meeting authorizing the employment of Mr. Bryant at $60,000 per year. In the absence of any similar proof of Board action with respect to George Hinton, presumably, the witness meant that the corporations simply acted with respect to George Hinton as if the original contract between the Hinton brothers had been their own obligation, which, of course, it was not.

No dividends were either considered or declared by either corporation for the fiscal years 1967 or 1968.

While the case originated with a suit for refund for an alleged overpayment of taxes by the two corporations for the two fiscal years 1967 and 1968, the trial court separated the year 1968 for the purpose of making a final judgment in favor of the taxpayers, and we have here for consideration only an appeal from the judgment affirming the jury's verdict with respect to the reasonableness of the 1967 salaries for George

Hinton and Garden Miller. The Internal Revenue Service contended that Miller Box, Inc. unreasonably accumulated surplus in the year 1968 within the concept of Section 531 of the Internal Revenue Code, and, since that issue was delayed by virtue of renegotiation proceedings pending against the company, the trial court did not enter a final judgment on the jury's verdict that George Hinton's salary of $657,845 for fiscal 1968 was deductible. However, since the two years were tried together, and since the trial court has already by order, though not in final form, approved the jury's finding as to the 1968 salary paid to George Hinton, we have included statements concerning this item because we consider it relevant to the whole question of reasonableness of the 20 per cent contingent salary which Miller Box, Inc. was paying to George Hinton.

We deal here with a jury verdict approved by the trial court, and adhered to by the trial court upon the denial of a petition for judgment as to the 1968 amount n. o. v., but which the trial court has not made the basis of a final judgment allowing recovery by the corporate plaintiff for 1968 in the refund suit, pending further proceedings not related to the salary question dealing with the 1968 fiscal year.[2]

The issues were drawn in this case by the disallowance by the Internal Revenue Service of the amounts of compensation shown. The Director determined that reasonable compensation for the services of George Hinton for fiscal 1967 was $60,000, to be paid by Miller Box, Inc., and $30,000 to be paid by Northport Box, Inc. The Director found that reasonable compensation for Garden Miller, Jr., for the year 1967, would be $41,000 by Miller Box, Inc., and $41,000 by Northport Box, Inc. The Director also found that reasonable compensation for fiscal 1968 for George Hinton would be $60,000.

The burden is on the taxpayer to prove the correctness of claimed deductions.

This may also be expressed by saying that a determination by the Commissioner on the reasonableness of compensation is deemed to be correct and the taxpayer has the burden of overcoming that determination as to what is a reasonable amount. *See* Botany Mills v. United States, 278 U.S. 282, 49 S.Ct. 129, 73 L.Ed. 379 (1928); Miles-Conley Co. v. C. I. R., 173 F.2d 958, 960 (4th Cir. 1949).

The standard by which a trial court determines whether a motion for directed verdict or for judgment notwithstanding the verdict should be entered has been stated by this court in Boeing Company v. Shipman, *supra,* 411 F.2d at 374, where this court said:

> On motions for directed verdict and for judgment notwithstanding the verdict the Court should consider all of the evidence—not just that evidence which supports the non-mover's case—but in the light and with all reasonable inferences most favorable to the part opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motions is proper. On the other hand, if there is substantial evidence opposed to the motions, that is, evidence of such quality and weight that reasonable

---

2. Following the jury's answers to special interrogatories that George Hinton's salary payments by Miller Box, Inc., of $197,372 for the fiscal year ending February 28, 1967, and by Northport Box, Inc. of $287,805 for the fiscal year ending November 30, 1967, and by Miller Box, Inc. of $657,845 for the fiscal year ending February 29, 1968 were "reasonable compensation" the government filed its motion for judgment n. o. v. as to each amount to the extent that it exceeded the salaries determined by the Commissioner to be reasonable; these amounts are discussed later. The trial court entered an order denying this motion and made an adjudication in favor of the respective taxpayer corporations for tax refunds for both 1967 and 1968, but withheld entering a *final* judgment for 1968 pending resolution of the section 531 claim of the government.

and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motions should be denied, and the case submitted to the jury. A mere scintilla of evidence is insufficient to present a question for the jury. The motions for directed verdict and judgment n. o. v. should not be decided by which side has the better of the case, nor should they be granted only when there is a complete absence of probative facts to support a jury verdict. There must be a conflict in substantial evidence to create a jury question.

The nature of the proof in such a case as this must be viewed in light of Treasury Regulations dealing with Section 162, quoted above. Because of the significance of these Regulations to the determination of the case we quote them here in full:

B. Treasury Regulations on Income Tax, 1954 Code (26 C.F.R.): *Section 1.162–7: Compensation for Personal Services.*

(a) There may be included among the ordinary and necessary expenses paid or incurred in carrying on any trade or business a reasonable allowance for salaries or other compensation for personal services actually rendered. The test of deductibility in the case of compensation payments is whether they are reasonable and are in fact payments purely for services.

(b) The test set forth in paragraph (a) of this section and its practical application may be further stated and illustrated as follows:

(1) Any amount paid in the form of compensation, but not in fact as the purchase price of services, is not deductible. An ostensible salary paid by a corporation may be a distribution of a dividend on stock. This is likely to occur in the case of a corporation having few shareholders, practically all of whom draw salaries. If in such a case the salaries are in excess of those ordinarily paid for similar services and the excessive payments correspond or bear a close relationship to the stockholdings of the officer of employees, it would seem likely that the salaries are not paid wholly for services rendered, but that the excessive payments are a distribution of earnings upon the stock. . . .

(2) The form or method of fixing compensation is not decisive as to deductibility. While any form of contingent compensation invites scrutiny as a possible distribution of earnings of the enterprise, it does not follow that payments on a contingent basis are to be treated fundamentally on any basis different from that applying to compensation at a flat rate. Generally a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid.

(3) In any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances. The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contrace is questioned.

A careful reading of the record in this case convinces us that all of the evidence with all reasonable inferences most favorable to the taxpayers that can be drawn therefrom does not rise to that *modicum* of evidence described as "substantial" so as to require submission of the issue to a jury. We conclude, therefore, that the trial court erred in denying the motion for directed verdict and, thereafter, for denying the motion for judgment n. o. v. filed by the government.

■ It is apparent that the affairs of James Hinton, Garden Miller, Sr., and George Hinton, who operated the partnership Miller Box, the corporation Miller Box, Inc. and the corporation Northport Box, Inc., (both of which were completely dominated by James Hinton) were treated casually and informally. All parties seem to have overlooked the fact that once Miller Box, Inc. and Northport Box, Inc. were incorporated each of them became completely separate entities subject to the requirement that they operate within the requirements of the provisions of the Internal Revenue laws respecting the limitations placed on them as to amounts that could be deducted for services of officers and employees as a part of the expense of operation. It would be impossible for the jury to make a finding that compensation paid by Miller Box, Inc. was reasonable merely by proof that George Hinton worked very long hours six or seven days a week for Miller Box, Inc. *and* Northport Box, Inc. *and* Miller Box, the partnership, without differentiating between the services performed for each. The same, of course, is true as to Northport Box, Inc. It had its own obligation to establish the fact that the salary paid to George Hinton was both reasonable and for services actually rendered to it. This could not be done by showing the tremendous activity testified to by James Hinton and George Hinton as to the latter's work habits dealing with the problems of the partnership, Miller Box, Inc., Northport Box, Inc. and his 400 acre farm which according to his testimony he visited once or twice a month.

The significance of the need to present evidence to the fact finder to support a claimed deduction for compensation by each of George Hinton's employers separately is made plain from the fact that he was paid $197,372 as general manager of Miller Box, Inc. a corporation employing 200 employees and he was paid as general manager of Northport Box, Inc. a salary of $287,805 although this was a plant with 130 employees and was not incorporated until nine months after Miller Box, Inc. had been operating on a rising demand for ammunition boxes because of the escalation of the Viet Nam War.

The need for differentiating the obligations of the separate corporations to justify their deductions for salaries is further glaringly illustrated by the fact that the jury was permitted to consider the issue of reasonableness of Garden Miller, Jr.'s salary of $164,461 paid to him for the fiscal year 1968 by Miller Box, Inc. at a time when he was no longer assistant plant manager of that corporation but was plant manager of Northport Box, Inc. and there was an utter lack of evidence as to services performed by him for Miller Box, Inc. This amount was set aside by the trial court on a motion for judgment n. o. v.

We consider it putting the matter mildly to state that the court's credulity would be gravely taxed if it were argued seriously that any person, no matter how qualified and no matter how hard working, who was not in a position of close family relationship to the owners of a business would have been able to benefit from a contract, terminable at will, which earned him such astounding sums as were paid to George Hinton and Garden Miller, Jr. for their services in managerial capacities of these two box manufacturing companies. It must be remembered that in addition to these two persons both corporations had a full panoply of plant managers, superintendents, foremen and the like as readily testified to be George Hinton. It must also

be borne in mind that neither of these officials had the responsibility of obtaining the contracts from the government, although they testified that they helped prepare the figures to enable the partnership to bid on the contracts. The business was obtained solely by the partnership consisting of the brother of George Hinton and the father of Garden Miller, Jr. and parcelled out by it to the two corporations which then paid out these tremendous salaries to the two employees.

■ The taxpayers' principal contention to support these large deductions is that the contract entered into in December, 1965, was a contingent percentage contract, and that the fact that the percentage of profit proved out to be so enormous was purely fortuitous and was not to have been anticipated because no one knew how profitable the business was going to be. While we do not intend to invade the province of the fact finder, and although it is not necessary to our conclusion in this case, because of the lack of evidence to support the reasonableness of the compensation, we think it is important to point out the following facts: The contracts are to be viewed *not* as of December, 1965, but, as it relates to the Miller Box, Inc. salary agreement with George Hinton, as of a date no earlier than March 1, 1966, and possibly later, and no earlier than December 1, 1966, as to the employment "contract" with Northport Box, Inc. because that is the date on which the latter taxpayer started business. The same is substantially true with respect to the employment of Miller. The employment contract between him and Miller Box was not signed until March 28, 1966, and that with Northport was executed on December 17, 1966. Before obligating themselves to pay salaries that were as open ended as these were, if they intended to deduct the amounts paid for corporate income tax purposes, they were required to determine what was reasonable compensation, "fair and advantageous" to them as corporations (Regs. 1.162–7(b)(2) *supra*).

The absence of recorded formal action with respect to the authorization of the contract for compensation paid to George Hinton and the absence of any showing as to when the stockholders or directors gave the appropriate consideration to a determination of what would be reasonable makes it impossible to know exactly when George Hinton's contract of employment at 20 per cent of profits before taxes was actually made a legally binding determination by the taxpayer. It is clear that at the time Miller Box, Inc. started its operation, it did so because of the fact that the partnership had more business from the United States Government than it was able to handle in its then existing plant. It is clear from the evidence that Garden Miller, Jr.'s contract was formally executed by Miller Box, Inc. on March 28, 1966, which, although during the first month of operation, was also at a time when the corporation which employed him had been brought into existence by persons holding contracts whose value had already been demonstrated. Even more, so far as employment by Northport Box, Inc. is concerned, both George Hinton and Garden Miller, Jr. were employed at least nine months after Miller Box, Inc. had been operating and after the partnership owners concluded that they had more business than could be handled both in the partnership plant and in the Miller Box, Inc. plant.

These comments are made to indicate that it is clear that the time for evaluating the employment contracts by these two corporations was *not* December, 1965.

In order that it may be clear that we have not failed to comprehend fully whatever strength may be said to lie in evidence on behalf of the taxpayer, we quote from the taxpayer's brief as to the performance of these two employees:

First, as to George Hinton:

George Hinton went to work at six every morning and he was there at midnight to one o'clock getting home. He was available for phone calls from truck drivers all during the night.

On Saturdays and Sundays he generally worked shorter hours, 12 to 14 hours, which included working at Northport as well as Miller Box. He had to be at the plant around six in the morning to start one plant, and would get it started at seven and would then make his rounds to the other plant, running two shifts through 12:15. He was there practically every night until closing.

During the day he bought lumber, made new designs on machinery, new layouts to put the machinery and set up different lines. He also attended to his trucks which were running approximately 27 trucks and 35 to 40 trailers. He did his own hiring on truck drivers, made truck reports to the various states which they ran from Tuscaloosa to Illinois and from Alabama to Canada. He had authority to veto any hiring or firing of employees. He had to go to the arsenal quite often on reject boxes and on occasion drive the trucks for a rush load when the driver was out. He helped figure bids for government contracts. He scheduled production based on orders received and was in charge of packaging, dispatching and routing shipments to consignees. He ran the two plant sites and was on the management team for both plants. There were weekly, almost daily, conferences as to what was to be done at which plant.

Second, as to the services of Garden Miller, Jr. as assistant plant manager of Miller Box, Inc., and later in the year as plant manager of Northport Box, Inc.:

Garden Miller, Jr. performed services for Miller Box, Inc. primarily in connection with quality control, production control, and inventory control, helping and maintaining production. His work covered the inspection of boxes, maintenance of machines, development of new machines. He made suggestions as to the firing and hiring of certain employee personnel and made reports on difficulties with labor and their performance, trying to keep the labor costs down as much as possible. After he took over the additional duties as plant manager of the Northport Box plant, he hired and trained personnel, supervised production, and worked closely with George Hinton, carrying out orders for George Hinton. He became an expert with inspection, which is always a problem with any manufacturing production, and he would go to the arsenal and get matters corrected. It was also his responsibility when machines were transferred from one place to another to see that the machinery was running correctly at both plants.

While he spent most of his time at Northport Box after becoming plant manager, he continued to spend a large amount of time at Miller Box, Inc. with problems regarding rejected boxes, new machines, helping to work new machines in the production line where they would be placed, and working out how much labor it would take to use them. He would also meet together there as a member of the management team for both plants and discuss the common problems that the two plants had. He held a B.S. degree from the University of Alabama with two majors—one in Industrial Management and one in General Business —and had worked in the box business for the partnership, Miller Box Company, during the prior approximately ten years, starting with summertime work and going to work on a full time basis in the summer of 1964.

While these excerpts from the appellees' briefs do not, of course, include every bit of evidence adduced on behalf of the taxpayers, it may properly be assumed that they do present the best case possible in support of their position. There should be added, however, with respect to the taxpayers' claim as to the reasonableness of George Hinton's salary the fact which was testified to on trial about the possibility of his having accepted an offer of a friend to go into

a fifty-fifty partnership with him for the manufacture of boxes. The testimony further indicates that the December, 1965 contract between James Hinton and George Hinton was entered into as a means of persuading the latter not to consider seriously the proposition of his friend. There was no evidence as to the likelihood that if such a new organization had been created it would have had any real success or opportunity in obtaining contracts for the box manufacturing as to which the partnership Miller Box had been so successful. It, therefore, is no evidence as to the value of George Hinton's services to the two corporations which were later organized.

Two additional facts should be noted with respect to Garden Miller, Jr. The first is that he was 23 or 24 years old, according to the year here dealt with at the time of his employment by these two corporations. At the time of the employment contract by Miller Box, Inc. with him he had been working for Miller Box, the partnership consisting of his father and James Hinton in their plant at wages of approximately $200 a week. Moreover, while counsel was justified in the quoted portion of the statement relating to Garden Miller's activities to say "he continued to spend a large amount of time at Miller Box, Inc.," this statement must be held to have been severely modified by Miller's own testimony on cross-examination during which the following occurred.

Q. Now your office after you became manager at Northport's plant, manager at Northport Box, Inc., your office was physically located at Northport, Inc., right?

A. Correct.

Q. But you would make maybe on the average one trip a week over to Miller Box, Inc., to coordinate-liaison, correct?

A. One trip a week would be hard to say. On an average I believe it would be more than that.

Q. Would it not be a true statement to say as follows, on the average you went to Miller Box, Inc. once a week, and you may stay a full morning or sometimes a longer or shorter period of time, would that be a fair statement, referring specifically to your time from Northport Box, Inc. when you were plant manager, how much time you would spend over here, would that not be a fair and truthful and accurate statement sir?

A. It would certainly be approximation.

Q. Would it be an approximation that you would give the jury?

A. Yes.

There are two other matters as to which there can be no dispute, which we are satisfied must put a gloss on the generalized statements dealing with the duties of George Hinton and Garden Miller, Jr. These two corporations were not engaged in highly technical or complex operations of the kind sometimes dealt with by the tax court or the appellate courts in an effort to determine what might be reasonable compensation for management. *Cf.* Mayson Manufacturing Co. v. Commissioner of Internal Revenue, 178 F.2d 115 (6th Cir. 1949). The testimony of the principal entrepeneur of these three businesses, James Hinton showed very clearly that in the realm of the manufacturing industry the operation must be deemed a simple one. Mr. Hinton testified

Well an ammunition box is a wooden box consists primarily wood. (sic) But it is assembled with nails, hardware used for—to put the top on to secure the top, rope handles to pick the box up, and primarily those are the ingredients making ammunition boxes . . .

Again, the evidence touching on the activities of George Hinton with respect to the purchasing of lumber must be viewed in light of the other fact that Miller Box, Inc. engaged Coach Bryant at a salary of $60,000 per year. In support of the taxpayer Miller Box, Inc.'s

contention that this was a reasonable salary to be paid to him it adduced testimony that was undisputed to the effect that he was personally responsible for the obtaining of some million board feet of lumber and that but for his efforts the plant might have been shut down as much as 15% of the time.

Primarily, the difficulty with the taxpayers' case is that there is a recitation of undifferentiated activities for, and on behalf of, two entirely separate corporations each of which paid salaries in excess of those which the Commissioner determined to be reasonable under the circumstances. The evidence shows intense activity by George Hinton in the realm of long hours, which would normally be required if he held down two full time jobs.[3] The evidence did not indicate to what extent the activities described in the foregoing statement exercised by George Hinton were performed for the partnership in return for his $12,000 to $15,000 salary received from it. It must be borne in mind that the partnership itself was the obligated person under the contract with the government. There is no evidence that George Hinton's and Garden Miller's having to "go to the arsenal quite often on reject boxes" was to discharge an obligation of the partnership or for one taxpayer or the other.

In brief, there is nothing stated as to the activities of either of these employees that they did anything other than work full time in the day to day operations of any manufacturing plant, unless we consider the statement that "on occasion [George Hinton had to] drive the trucks for a rush load when the driver was out."

There is not a line of evidence in this record that seeks to put a money value either by estimate, opinion or demonstrated fact of any of the activities performed by these two employees. Not even the employees themselves undertook to testify that in their opinion the compensation paid them, even under the contingency formula, was reasonable. There was, of course, no proof offered by the taxpayers of comparable compensation arrangements by competitors or others in the same business.[4] The only such proof adduced by witnesses for the taxpayers came in cross-examination of Mr. James Hinton. In the course of this cross-examination he conceded that Northport Box, Inc. could have hired a plant manager at the time it engaged Garden Miller, Jr. (whose compensation for fiscal 1967 equalled $71,000) for $25,000 to $35,000 per year.

The significance of this is pointed up by language of the Board of Tax Appeals, the antecedent of the tax court, quoted with approval in Crescent Bed Co. v. Commissioner of Internal Revenue, 133 F.2d 424 (5th Cir. 1943) in an opinion written by Judge Sibley:

The respondent [Director] has allowed salaries of $25,000 each to the two officers as a reasonable compensation for services rendered. It was petitioner's burden to demonstrate that such salaries were unreasonably small. This the record made at the hearing does not do. We have no evidence of salaries paid by comparable firms, nor any suggestion of proof that it would have cost more than $25,000 per year to replace either of the two officers. On the facts before us we hold that petitioner has not proven respondent's determination to be error. 133 F.2d 424, 425.

The government, in this case, saw fit to introduce into evidence executive sala-

---

3. It is to be noted that the director does not undertake to say that the $60,000 salary determined by him to be reasonable compensation to be paid by Miller Box, Inc. is to be compensation for the full time devoted by George Hinton, for the Commissioner also found that the payment by Northport Box, Inc. of $30,000 for the same year would be reasonable and it is to be remembered that in addition he received a salary of between $12,000 and $15,000 from the partnership Miller Box.

4. As will be pointed out later, the government did offer such evidence, but at this point we are dealing only with the absence of adequate proof by petitioners to overcome the presumption in favor of the Director's determination as to reasonable compensation.

ries from comparable firms engaged in the box manufacturing business, firms which were conceded to be major competitors of the taxpayers here. The following tables summarize these payments.

| Competitor | Chief Executive Officer | Plant Manager |
| --- | --- | --- |
| Marvel Box Co. | $10,250–$13,500 | $10,250–$12,000 |
| Milan Box Co. | $37,750–$39,700 | $37,750–$39,700 |
| Ozark Box Co. | $54,298–$65,246 | |
| Bennett Box Co. | $100,000 | $13,000–$32,500 |

We think a further comment is in order, because of the stress placed by the taxpayers on the contingency feature of these employment contracts. It must be borne in mind that it is the duty of the Directors of the corporation, ordinarily placed on them by their obligation to the stockholders, but in any event placed on them so far as deductibility for tax purpose is concerned, by the Internal Revenue laws, to bargain with an employee for "fair and advantageous terms" to obtain the services of such individuals. Thus, Miller Box, Inc. had the obligation to make a fair and advantageous contract for the employment of George Hinton at whatever time (which is not disclosed in the record before us) it actually undertook to carry out the terms of the agreement made between James Hinton and George Hinton in December, 1965. It was under no obligation to hire George Hinton at all by reason of the personal agreement, because it was an entirely separate legal entity. Of course, the same is true of Northport. Moreover, the personal contract on its face does not appear to be for any certain term and, so far as appears, could be terminated at will.[5]

In sum, therefore, we are without doubt that there is a complete ab-

sence of probative facts to support the jury verdict as to the reasonableness of the amounts paid to George Hinton and Garden Miller, Jr. for either or both of the corporations for which they worked. This leaves no alternative to this Court but to conclude that the Director's determination as to reasonable salaries for the persons and taxpayers concerned must stand.

The judgment of the trial court is reversed and the case is remanded for further proceedings not inconsistent with this opinion.

---

5. If Miller Box, Inc., acting through an independent Board of Directors, which of course it did not have, had determined to make an employment contract with George Hinton only at a flat salary of $60,000 a year and he had been willing to accept it he might well have had a suit against his brother James for not having carried out the obligations which James assumed in the 1965 contract, but this is a matter with which Miller Box, Inc., the taxpayer, is not concerned. The same, of course, is true, but to a much more significant extent, with respect to Northport

Box, Inc. This corporation was organized after nine months of successful operation of Miller Box, Inc. Its success was assured at least to the extent that its incorporation represented the unqualified best judgment of all of the persons who had been engaged in this lucrative business for several years. The reasonableness of the contract made must be viewed as of that time, and entirely unrelated to whatever obligations James Hinton as an individual and George Hinton, his brother had undertaken towards each other a year previously.