SAIA ELECTRIC, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Saia Electric, Inc. v. Commissioner
Docket No. 2050-73
United States Tax Court
T.C. Memo 1974-290; 1974 Tax Ct. Memo LEXIS 27; 33 T.C.M. (CCH) 1357; T.C.M. (RIA) 740290; November 18, 1974, Filed. *27 Based on all the facts presented, compensation paid by petitioner to its president and major shareholder was unreasonable and excessive. Held: Reasonable compensation determined. Theodore L. Jones and Kenneth Addison Duncan, for the petitioner. Paul H. Waldman, for the respondent. STERRETT
MEMORANDUM FINDINGS OF FACT AND OPINION STERRETT, Judge: Respondent determined a deficiency in the corporation income tax of Saia Electric, Inc. for the taxable year ended February 28, 1969 in the amount of $ 106,282.68. The sole issue for decision is whether respondent erred in determining that a portion of the deduction on Saia Electric, Inc.'s income tax return *28 for compensation to its president and major shareholder was unreasonable and excessive and therefore not within the ambit of section 162(a) (1) of the Internal Revenue Code of 1954. [1]
FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference. Saia Electric, Inc. (hereinafter petitioner) is a corporation organized under the business corporation laws of the State of Louisiana, and whose principal place of business was 6175 Confidence Street, Baton Rouge, Louisiana at the time of filing its petition herein. Petitioner was organized on March 17, 1960, for the primary purpose of engaging in and conducting the business of an industrial electrical contractor. Petitioner maintains its books and records and files its income tax return using the completed contract method of accounting. From inception through to and including the taxable year in issue, Frank J. Saia (hereinafter Saia) was the president and major shareholder of petitioner. During *29 the fiscal year ended February 28, 1969, Saia owned 98.7 percent of the petitioner's outstanding capital stock. Sais first acquired experience in the electrical contracting business by working for Sachse Electric, Inc. (hereinafter Sachse) in Baton Rouge, Louisiana. He began as a truck driver and part-time helper in 1941. After a period of military duty, he returned to Sachse in 1945. Saia made steady progress in the company starting out as a truck driver, working as an apprentice electrician and as a warehouseman, and finally becoming general manager and vice president. As general manager and vice president of Sachse, Saia had multiple responsibilities. He solicited a large majority of the contracts, supervised the job department that estimated and priced prospective jobs, supervised technical and field personnel, assigned the manpower to the various jobs, and supervised the purchasing department. Saia also traveled throughout the United States and abroad representing Sachse and handled various labor relation problems. For these services Saia in 1958 and 1959, his last 2 years with Sachse, received approximately $ 1,000 per week in salary and bonuses. He also received *30 fringe benefits which included a life insurance policy and a retirement plan. In 1958 Saia was granted an option, with favorable terms, to acquire control of Sachse from the Sachse family on the death of Maurice B. Sachse, the president of the company. The option terminated when Saia ended his employment with Sachse. In the latter part of 1959, Saia had an accident for which hospital care was needed. Upon his return to work in the early part of 1960, disagreements arose, and Saia left the company to form petitioner. Saia formed petitioner in March, 1960 with $ 15,400, of which $ 10,000 was borrowed. Saia was the sole shareholder and president. Petitioner's beginnings were modest. It started with four basic employees - Saia, as president, was in charge of all phases of the business, Grace P. Saia, Saia's wife, helped in the office, Rocco J. DeBenedetto, Jr. (hereinafter DeBenedetto) served as Saia's assistant, and a gentleman who left Sachse with Saia was an estimator. Saia does not have a college degree or any degree in engineering. After its first fiscal year, which ended on February 28, 1961, petitioner's tax return showed gross receipts of $ 199,204.70 and taxable *31 income of $ 13,360.26. [2]Saia's compensation for the year was $ 6,425,. By the end of fiscal year February 28, 1965, petitioner's tax return showed gross receipts of $ 1,007,162.52 and taxable income of $ 80,121.51. Saia's compensation for the year was $ 54,397.85. [3] Also reported was a cash distribution of $ 5,966.80. During this period Saia received a salary and a bonus based on 20 percent of the net profits. On March 1, 1965, a special meeting of petitioner's board of directors was held. In attendance were Saia, Grace P. Saia, and Etta Marie Saia (Saia's sister). The purpose of the meeting was to consider an "Executive Employment Contract" between petitioner and Saia. Under the terms of the proposed contract Saia was to receive 40 percent of *32 the net profits of the petitioner after deducting all costs and expenses except income taxes and Saia's compensation. The contract was to last 2 years with month-to-month extensions thereafter until the agreement was terminated. Upon presentation to the board of directors a resolution approving this proposed compensation contract was unanimously adopted. The contract was then signed by Saia on behalf of the petitioner and by Saia in his individual capacity. An additional provision to the contract was later proposed and adopted by petitioner's board of directors at its regular annual meeting. The addendum provided: Any payment made to Frank J. Saia pursuant to his employment contract dated March 1, 1965, or any payment to him or any other officer of the Corporation, for compensation, bonuses, interest, rent, travel, entertainment, or other expenses incurred by him that is determined to be excessive, unreasonable or otherwise unallowable, in whole or in part, as a deductible expense by any governmental agency, such officer shall have an unconditional obligation to reimburse the Corporation to the full extent of such unallowable expense. Since the adoption of this contract, *33 Saia's compensation has been calculated according to its terms. Petitioner's tax returns for the taxable years ending February 28, 1966, through February 28, 1969, show the following figures; Fiscal Year
Gross
Taxable
Total Officers'
February 28
Receipts
Income
Compensation
1966
$ 1,491,199
$ 123,566
$ 112,225
1967
3,040,614
277,515
228,775
1968
2,525,453
219,317
197,691
1969
4,614,260
405,548
343,298
Fiscal Year
Saia's Compensation
DeBenedetto's
Retained Earnings February 28
Compensation
1966
$ 91,600
$ 15,225
$ 274,059
1967
203,485
18,400
334,389
1968
162,662
20,180
446,213
1969
301,293
22,675
643,484
Fiscal Year
Gross Receipts
Taxable Income
Total Officers'
February 28
Compensation
1966
$ 1,491,199
$ 123,566
$ 112,225
1967
3,040,614
277,515
228,775
1968
2,525,453
219,317
197,691
1969
4,614,260
405,548
343,298
Fiscal Year
Saia's Compensation
DeBenedetto's
Retained Earnings
February 28
Compensation
1966
$ 91,600
$ 15,225
$ 274,059
1967
203,485
18,400
334,389
1968
162,662
20,180
446,213
1969
301,293
22,675
643,484
*34 During this period Saia devoted his full time to petitioner and as president was responsible for all affairs pertaining to it, including promotional activities and developing its bids for prospective contracts. Petitioner's success was due largely to his efforts. DeBenedetto also devoted his full time to petitioner and as vice president and general manager he had multiple duties, including supervisory responsibilities over the administrative and construction departments. During this period petitioner's dividend history was as follows: [4]
Fiscal Year Ended
Cash
Stock
February 28
1966
$ 942
100,000
1967
2,314
144,300
1968
15,600
-
1969
28,600
70,200
Beginning in the middle of 1965, petitioner's business be Beginning in the middle of 1965, petitioner's business began to change. In the past Saia had been *35 able to secure business for petitioner by pledging his personal guarantee. However, Saia advised the board of directors that the quantity and size of the recent available business was making the financial condition of the corporation more important than the financial condition of the individuals involved. For such business petitioner would be competing with larger firms. To compete successfully with these firms and for other reasons, Saia advised that petitioner be in a strong cash position. As the nature of petitioner's business changed its staff grew and became departmentalized. During fiscal year 1969, petitioner's organization chart reflected the following positions and compensation levels: $ M02,00,00$ G Position$ JCompensation on Calendar Year Basis $ D$ Qpresident$ B$ 301,293 [5]$ Qvice president and general manager$ B26,400$ Qsecretary-treasurer$ B20,305$ Qassistant secretary-treasurer and controller$ B8,040$ Qelectrical engineer$ B14,305$ Qpurchasing agent$ B13,615$ Qgeneral superintendent$ B14,397$ Qutility division manager$ B12,515$ X$ =P A separate individual was in charge of each position and *36 was responsible for the individuals in his department. the functions of these positions were established and day-to-day activities were performed with authority and discretion by the responsible individual. Major decisions were referred to Saia. Petitioner's style of growth is exemplified by the growth of the utility line division. In 1965 this department was managed by Russell Saia, Jr. At that time there were three line crews, one truck, and approximately 20 workers. By 1969 there were eight line crews, two trucks, and approximately 60 workers. Russell Saia, Jr. had sole responsibility for hiring and firing workers. He handled labor problems at the steward level, and occasionally consulted with his supervisor, DeBenedetto. Saia handled the problems that could not be resolved by Russell Saia and DeBenedetto. According to the terms of the compensation contract, Saia's compensation for fiscal year 1969 was $ 301,292.95. Petitioner deducted that amount on its tax return filed for that taxable year. Respondent determined $ 100,000 to be a reasonable salary or other compensation for personal services actually rendered by Saia within the meaning of section 162. Consequently *37 petitioner's income was increased by $ 201,292.95, which correspondingly increased petitioner's federal tax liability. OPINION Section 162(a) (1) provides that in computing its taxable income a corporation shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including "a reasonable allowance for salaries or other compensation for personal services actually rendered." The sole question presented for our decision is whether the amount paid as compensation by the petitioner corporation to its president and controlling shareholder was reasonable under the terms of section 162(a) (1), and therefore deductible. Petitioner compensated Saia for his services according to the terms of the employment contract entered into in March, 1965. Petitioner asks us to respect the terms of the contract as being made by two independent parties, and to hold that the resulting compensation is reasonable and therefore fully deductible. Support for this position can be found in the regulations to section 162. Income Tax Regs. section 1.162-7(b) provides: (2) The form or method of fixing compensation *38 is not decisive as to deductibility. * * * Generally speaking, if contingent compensation is paid pursuant to a free bargain between the employer and the individual made before the services are rendered, not influenced by any consideration on the part of the employer other than that of securing on fair and advantageous terms the services of the individual, it should be allowed as a deduction even though in the actual working out of the contract it may prove to be greater than the amount which would ordinarily be paid. (3) * * * The circumstances to be taken into consideration are those existing at the date when the contract for services was made, not those existing at the date when the contract is questioned.
However, Income Tax Regs. section 1.162-7(b) (3) restricts this providing that "[in] any event the allowance for the compensation paid may not exceed what is reasonable under all the circumstances. It is, in general, just to assume that reasonable and true compensation is only such amount as would ordinarily be paid for like services by like enterprises under like circumstances." Consequently compensation determined "pursuant to such * * * [a contingent] agreement is *39 not inherently reasonable." Charles Schneider & Co., Inc. v. Commissioner, 500 F.2d 148, 152 (8th Cir. 1974), affirming a Memorandum Opinion of this Court. Furthermore, where the compensation is paid to the employee who controls the corporation special scrutiny must be given to such salaries for there is a lack of arm's length bargaining as required by the regulations. Charles Schneider & Co., Inc., supra, Miller Box, Inc. v. United States, 488 F.2d 695 (5th Cir. 1974), The Barton-Gillet Company, 442 F.2d 1343 (4th Cir. 1971), affirming per curiam a Memorandum Opinion of this Court. This type of examination is needed because it would be a simple matter for the owner-employee to take the corporate profits out in the form of deductible compensation rather than dividends. On the other hand the reasonableness of the compensation paid to an owner-employee who renders valuable services should not be limited simply because the employee is also the owner and could have taken a part of the amount paid him in the form of dividends. The burden of proving reasonableness is upon the petitioner. *40 Botany Worsted Mills v. United States, 278 U.S. 282 (1929), and the question is one of fact to be determined from all the facts and circumstances of the particular case. Charles Schneider & Co., Inc., supra, Boyle Fuel Co., 53 T.C. 162, 169 (1969).As stated in Mayson Mfg. Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), reversing a Memorandum Opinion of this Court, the relevant facts and circumstances may be summarized as follows: Such factors include the employee's qualifications; the nature, extent and scope of the employee's work; the size and complexities of the business; a comparison of salaries paid with the gross income and the net income; the prevailing general economic conditions; comparison of salaries with distributions to stockholders; the prevailing rates of compensation for comparable positions in comparable concerns; the salary policy of the taxpayer as to all employees; and in the case of small corporations with a limited number of officers the amount of compensation paid to the particular employee in previous years. * * * In appraising the reasonableness of Saia's salary we are disturbed by several factors. *41 First, as Saia noted himself in May, 1965, only a few months after the compensation contract was adopted, the nature and quality of petitioner's business was changing. As the petitioner competed for larger contracts, its organization and abilities would be more important than Saia's personal influence. This attitude is reflected by petitioner's growth and the delegation of authority throughout the organization. At trial, respondent's witnesses testified that contracts were awarded to petitioner with the knowledge that certain employees would be responsible for field work. Consequently we believe that Saia's personal efforts were not responsible for all of petitioner's profits and therefore not all of Saia's compensation was for "personal services actually rendered." See Miller Box, Inc., supra. Having said that, we should point out that the record makes it clear that Saia was primarily responsible for petitioner's success. After petitioner was formed he was active in every phase of the business. He generated the major portion of petitioner's work. Even as petitioner grew, Saia continued to work full time retaining ultimate authority over its operations.Saia *42 should also be given credit for creating the organization that enabled petitioner to compete successfully with larger companies. We have no doubt that Saia rendered valuable services for petitioner, and they have an impact on the final determination. Secondly, we are concerned by petitioner's low level of cash dividend distributions. [6] For the fiscal year 1969, petitioner had taxable income of $ 706,841 before Saia's compensation. Petitioner's cash distribution during this year was $ 28,600 or approximately 4 percent of taxable income available for distribution. During this period and in prior years, petitioner's cash position was of constant concern to the board of directors. Even though the cash distribution for fiscal year 1969 represents an increase over prior years, we think it significant that petitioner's dividend distributions bore the brunt of this concern while Saia's compensation formula remained unchanged. In this area we also consider relevant the provision added to the employment agreement after it was adopted. *43 The agreement required any officer to repay to petitioner amounts received under the agreement but which were later declared to be excessive, unreasonable, or otherwise unallowable. This provision could relfect a pre-existing knowledge by petitioner that the payments would not be reasonable for tax purposes and could lead to an inference as to their intent. Charles Schneider & Co., Inc., supra at 155. Finally we are concerned about petitioner's salary policy with regard to its other officers and key employees. Over the years DeBenedetto gradually assumed additional responsibilities and during fiscal year 1969 he served as vice president and general manager. Yet his salary remained relatively stable and it does not appear that his compensation appropriately reflected his contribution to petitioner's success. In addition, the total compensation paid (including bonuses) by petitioner to its other officers and key employees was $ 109,577, while Saia's compensation was $ 301,293. We find it difficult to believe that Saia's services were worth approximately three times that of the other key employees combined. [7] We also consider relevant the fact that Saia was the only *44 officer who received contingent compensation. Petitioner had other individuals in responsible positions, yet contingent compensation arrangements were not necessary to secure their services. In support of his determination, respondent has introduced data about other firms in the electrical contracting business. This information shows that the presidents of these companies earned approximately $ 100,000 per year. Admittedly the information presented does not disclose the duties performed by these individuals. Our determination of this controversy necessarily depends heavily on the factual pattern as presented before this Court. Consequently, we find respondent's data helpful, but have not placed complete reliance on it in reaching our decision herein. [8]
*45 We recognize the value of Saia's services to petitioner.As we have noted he was largely responsible for its success. For this reason we cannot accept undisturbed the respondent's determination as to what constitutes reasonable compensation. We attempt the delineation of reasonable compensation in the knowledge that we are not bound to fix the amount with mathematical precision. Jones Brothers Bakery, Inc. v. United States, 411 F.2d 1282, 1294 (Ct. Cl. 1969). Accordingly, based on our findings of fact, we find reasonable compensation for Saia's services rendered during fiscal year 1969 to be $ 175,000. Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as amended. ↩
2. After an Internal Revenue Service audit taxable income was increased by $ 792.75 caused by disallowance of some deductions. ↩
3. After an Internal Revenue Service audit of Saia's individual tax returns for the years 1960, 1961, and 1962, additional amounts of $ 512.75, $ 2,415.30, and $ 2,054.50, respectively, were included as dividends received from petitioner, caused by petitioner paying for personal expenses of Saia. ↩
4. Petitioner's summary of its dividend history, prepared by its accountant from the audit reports and tax returns for this period, shows some variation from the above figures. It is not entirely clear from the record why this variation occurred, but in any case it is minimal and has no bearing on the outcome herein. ↩
5. Represents Saia's compensation for the fiscal year in issue. ↩
6. Petitioner's stock dividends are not relevant for this determination since they only represent a shift in its capital structure. ↩
7. We are aware that this represents a comparison of calendar year and fiscal year compensation figures respectively. However, we do not believe that a material distortion is created. ↩
8. In this vein, we also believe petitioner's reliance on John Miller Electric Company, Inc., a Memorandum Opinion of this Court dated November 26, 1945, which we find to be factually distinguishable, to be of little probative value. ↩