**AMERICAN FOUNDRY, a corporation, et al., Appellants,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Appellee.**

No. 74–1245.

United States Court of Appeals, Ninth Circuit.

April 23, 1976.

---

Robert H. Wyshak (argued), of Wyshak & Wyshak, Los Angeles, Cal., for appellants.

Robert G. Burt (argued), of Dept. of Justice, Washington, D. C., for appellee.

Before CHAMBERS, GOODWIN and WALLACE, Circuit Judges.

ALFRED T. GOODWIN, Circuit Judge:

Corporate and individual taxpayers appeal three Tax Court judgments which sustained deficiency determinations of the Commissioner. The Tax Court decisions are reported at 59 T.C. 231 (1972). We affirm in part and reverse in part.

Taxpayers are American Foundry, a close corporation; Dominic Meaglia, the corporation's founder, a majority stockholder, and ex-president; and Katie Meaglia, Dominic's wife.

American Foundry made payments to Dominic, or on his behalf, and to Dominic's daughter, Jean Meaglia Shives, a minority stockholder and officer. The Commissioner treated the payments as constructive dividends which were neither deductible to the corporation nor excludable from the gross income of the individual taxpayers. The Tax Court found for the Commissioner on most of the claims.

The history of the corporation and its relationship to the Meaglia family is set forth in the Tax Court opinion. The full schedule of the contested payments also appears there. The only issues in this appeal involve: (1) An annual payment of $18,000 to Jean Meaglia Shives for tax years 1965–70. The Tax Court allowed for each year only $7,000 as "reasonable" compensation. (2) Annual payment of $23,082 to Dominic for tax years 1965–70. The Tax Court held that these payments were not deductible as business expenses to the corporation and that Dominic could not exclude the payments from his gross income under 26 U.S.C. §§ 104 or 105. (3) Payment of Dominic's medical expenses for the same tax years. The Tax Court held that the corporation could deduct the payments as part of Dominic's § 162(a) "reasonable" compensation, but that Dominic could not exclude the payments from his gross income under § 105(b).

We review the findings of fact by the Tax Court with the deference dictated by the "clearly erroneous" test. *Collman v. Commissioner*, 511 F.2d 1263 (9th Cir. 1975).

1. *The $18,000 payments to Jean Meaglia Shives:*

In 1946 Jean Meaglia was graduated from the University of Southern California with a degree in business administration. She immediately went to work for her father, learning the foundry business from him. Since 1949, when her father's business was incorporated as American Foundry, Jean served as secretary-treasurer to the corporation. She was a 10% shareholder. She often ran the business when Dominic was away on vacation or on business trips. When Dominic suffered a debilitating stroke in 1963, Jean became *de facto* general manager of the corporation, direct-

ing day-to-day operations and planning long-range policy.

In 1964, Jean's husband Clyde, who was the sales manager of the corporation, became executive vice president at an increase in salary. Clyde and Jean rearranged some of their workload so that Jean could spend more time at home. The Tax Court found that Jean spent from twelve to twenty hours per week at the foundry and that she spent some time on corporation business in an office constructed in her home. Her income was reduced from approximately $25,000 to $18,000 by the corporation. But she still acted as a major business advisor and a major officer.

The Commissioner did not offer any evidence to contradict the testimony offered by the corporation that Jean remained a key contributor to the success of the business. There is no evidence on which to base an inference that someone else displaced Jean as general manager. The Tax Court found that Jean was the general manager for the period between her father's stroke (1961) and 1964; and we find no basis for rejecting her uncontradicted characterization of her activities after 1964. Those activities easily support the corporate taxpayer's burden of showing that $18,000 was a reasonable salary.

The Tax Court's determination that reasonable compensation for Jean should have been limited to $7,000 is clearly erroneous. The uncontradicted evidence proved that her services were worth at least $18,000 annually to the corporation, even with her reduced on-site participation at the foundry.

> 2. *The $23,082 payments to Dominic Meaglia:*

After Dominic's stroke in 1961, the Board of Directors voted to continue paying Do-

minic $23,082 per year, the amount of his salary at the time of his illness. The Board resolved that the payments should continue on the theory that the illness was caused by overwork. The Tax Court disallowed the corporation's deduction for the salary continuation, and also held that the payments were not excludable from Dominic's gross income.

■■■ Taxpayers argue on appeal that the Tax Court erred in denying treatment of the payments to Dominic under 26 U.S.C. § 105(c).[1] They dispute the Tax Court's holding that a "plan" is a precondition to operation of § 105(c); alternatively, the taxpayers argue that the resolution of the Board of Directors just after Dominic's stroke constitutes evidence of a "plan". Because the Tax Court found, as a fact, that American Foundry had no "plan" for salary continuation, and because the record reveals no reason for upsetting that finding, we accept the finding that American Foundry had no plan for salary continuation. The question remains whether a plan is required as a condition precedent to operation of § 105(c).

The words of the statute themselves do not yield an unambiguous answer. The word "plan" occurs only in the title of § 105 and in subsections (d) and (e) thereof. But a review of the legislative history points in but one direction. *See* S.Rep. 1622, 83d Cong., 2d Sess. § 105 (1954); 3 U.S.Code Cong. & Adm.News pp. 4645, 4818–19 (1954). The revision of the 1939 code provisions allowing exclusion of sickness, accident, or disability *insurance* proceeds was meant to allow employers to self-insure this species of welfare payments. The 1954 revision removed the need for the intermediary insurance company. The employer's self-insurance "plan" could be funded or

---

1. "§ 105. *Amounts received under accident and health plans.*

     \*     \*     \*     \*     \*     \*

   (c) *Payments unrelated to absence from work.*—Gross income does not include amounts referred to in subsection (a) to the extent such amounts—

   (1) constitute payment for the permanent loss or loss of use of a member or function of the body, or the permanent disfigurement, of the taxpayer, his spouse, or a dependent (as defined in section 152), and
   (2) are computed with reference to the nature of the injury without regard to the period the employee is absent from work."

paid out of an operating budget. But the legislative discussion never assumed that payments could be made either *ad hoc* or pursuant to a *post facto* plan. *See Chism's Estate v. Commissioner,* 322 F.2d 956, 961 (9th Cir. 1963).

We agree with the Tax Court that a "plan" is a precondition to operation of § 105. *See* Treas.Reg. § 1.105–5. To allow otherwise would permit a close corporation to transfer, tax-free, significant dividends in the form of health, welfare, and disability payments to stockholders, without meaningful reference to their roles as employees.

■ American Foundry asserts another theory to support the deductibility of the payments to Dominic. It contends that Dominic was undercompensated in the years immediately prior to his stroke. The Commissioner and the Tax Court were willing to accept this theory, but calculated that the amount of undercompensation was more than offset by the $60,000 paid to Dominic between late 1961 and the close of fiscal 1964. Everyone involved agreed that Dominic had been undercompensated during the time immediately prior to his stroke, but the taxpayer did not show that the Commissioner's determination that the amount of undercompensation was approximately $60,000 was incorrect.[2] Therefore, the view of the Commissioner prevails. *Helvering v. Taylor,* 293 U.S. 507, 515, 55 S.Ct. 287, 291, 79 L.Ed. 623, 629 (1935); *Rockwell v. Commissioner,* 512 F.2d 882, 886 (9th Cir.), *cert. denied,* 423 U.S. 1015, 96 S.Ct. 448, 46 L.Ed.2d 386 (1975).

3. *Medical Reimbursements to Dominic:*

■ Following his stroke, Dominic required extensive medical and nursing care. The corporation paid these medical expenses pursuant to a 1957 resolution, which provided that medical expenses of "officers and dependents to the extent not covered by existing insurance" be paid as permitted by § 105(b). The "existing insurance" referred to in the resolution was a group policy which covered all the officers of the corporation except Dominic.

The Tax Court agreed that the corporation had tried to qualify the plan under § 105 and that the resolution was evidence of a plan, but held that because there was no rational basis for distinguishing between Dominic and the other officer-employees, the plan was not "for employees". We believe that the Tax Court applied an incorrect and overly stringent view of the law in this matter.

The medical reimbursement section, § 105(b), allows an individual to exclude from income amounts received from employer-funded medical insurance. Section 105(e) equates an employer-funded "plan for employees" with "medical insurance" for the purposes of § 105(b).

A "plan" need not be fully formalized in order to be treated as a plan under § 105. *See* Treas.Reg. § 1.105–5. The corporate resolution of 1957 sufficiently evidenced a plan to pay all the medical expenses of officers who were without other medical insurance.

The Commissioner asserts that the "plan" was not a plan *for employees.* A plan, in order to qualify, must benefit all employees, Rev.Rul. 71–588, 1971–2 Cum.Bull. 91, or some identifiable class of employees. A plan can be for as few as one employee, Treas.Reg. § 1.105–5, but there must be some rational basis other than ownership of the corporation to discriminate among employees. *See Levine,* 50 T.C. 422 (1972).

Plans limited to corporate officers have been upheld, *E. B. Smith,* T.C.Memo 1970–243, 29 CCH Tax Ct. Mem. 1065 (1970), even when those officers are stockholders in the corporation. *Nathan Epstein,* T.C.Memo

2. In order to show that the Commissioner had miscalculated the amount of undercompensation, petitioners had to show the amount of undercompensation per year and the number of years this condition existed. By stipulation, taxpayers showed the amount of undercompensation per year, but failed to introduce any evidence about the number of years the condition lasted. The Tax Court specifically warned that the "throwback"—the number of years Dominic was undercompensated—was in issue; it specifically rejected a stipulation that the throwback should go back to 1949, the year of incorporation.

294

1972–53, 31 CCH Tax Ct. Mem. 217 (1972). The appropriate key to deciding whether a plan is "for employees" or "for shareholders" is whether the expected benefits of the plan are to be paid with respect to the individual's capacity as an employee of the corporation and whether there is any rational basis other than ownership to differentiate that individual from other employees.

We note that the "rational basis" test for creating subclasses of employees is not nearly as strict as the nondiscrimination requirements applicable to qualified pension and profit-sharing plans. The statute is silent, but the legislative history is instructive. The original House version of § 105 contained strict nondiscrimination rules. See H.Rep. No. 1337, 83d Cong., 2d Sess. 15 (1954); 3 U.S.Code Cong. & Adm.News p. 4039 (1954). The Senate Finance Committee deleted those provisions and the Senate version was adopted. H.Rep. No. 2543, 83d Cong., 2d Sess. 24–25 (1954), 3 U.S.Code Cong. & Admin.News p. 5283 (1954). See also Bogene, Inc., T.C.Memo 1968–147, CCH Tax Ct. Mem. 730, 734 (1968).

The Commissioner relies in part on Larkin v. Commissioner, 394 F.2d 494 (1st Cir. 1968). The discussion of a plan "for employees" there was dictum, however, because the case held that the ad hoc payments made to employees, without prior notice, did not constitute a plan. The court said that, because the payments were made only to stockholder-employees, it also was not a plan "for employees".

The Commissioner also tries to distinguish Smith, Epstein, and Bogene, supra. The distinctions drawn create no difference. At the time of the resolution, Dominic was indisputably the linchpin, the "key man". Furthermore, by the terms of the resolution, any officer who dropped his or her group medical insurance would have been covered by the corporate resolution. There were officers who were not shareholders and shareholders who were not officers. The plan, as enacted, was a plan for employees.

The decision of the Tax Court is reversed as to the deductibility of salary payments to Jean Meaglia Shives and the exclusion of the medical reimbursement payments from Dominic's income. The Tax Court's opinion is affirmed in all other respects.