T.C. Memo. 1997-251


UNITED STATES TAX COURT


JOHN L. GINGER MASONRY, INC., Petitioner <u>v</u>. COMMISSIONER
OF INTERNAL REVENUE, Respondent


Docket No. 1695-95.                    Filed June 4, 1997.


<u>Gary E. Reddish</u> and <u>Scott R. Heil</u>, for petitioner.

<u>Maria D. Murphy</u> and <u>Margaret Kuo</u>, for respondent.



MEMORANDUM FINDINGS OF FACT AND OPINION

CLAPP, <u>Judge</u>:  Respondent determined the following

deficiencies in petitioner's Federal income taxes:

| FYE June 30 | Deficiency |
|---|---|
| 1990 | $227,677 |
| 1991 | 52,981 |
| 1992 | 72,081 |

The issue for decision is whether the compensation paid to petitioner's shareholder in its fiscal years ending 1990 and 1992 is deductible by petitioner as reasonable compensation under section 162(a)(1). We hold that it is.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

FINDINGS OF FACT

We incorporate by reference the stipulation of facts and attached exhibits. John L. Ginger Masonry, Inc. (petitioner), is a California corporation whose principal place of business was in Riverside, California, when the petition was filed. Petitioner operates on a fiscal year ending June 30. The deficiency determined by respondent for the fiscal year ended June 30, 1991, stems solely from adjustments tied to the fiscal years ended June 30, 1990, and June 30, 1992.

A. Petitioner

Petitioner is a masonry contractor that specializes in brick, stone, and block masonry. Petitioner's founder, John L. Ginger (Ginger), has spent his entire career in the construction

business. Ginger's father was a contractor, and Ginger worked for him during the summers. Ginger had no formal education past high school. When Ginger completed high school, he began working full time for his father. Ginger worked for other contractors before starting his own masonry contracting business as a sole proprietorship in 1978 with a capital investment of $500 and one employee.

In September 1984, Ginger formed petitioner with a capital investment of $15,000. Ginger and his wife, Toni S. Ginger (Mrs. Ginger), owned equally all of petitioner's issued and outstanding shares of stock. Ginger and Mrs. Ginger serve as petitioner's board of directors. During the fiscal years ending 1985 through 1992, Ginger served as petitioner's president, and Mrs. Ginger served as petitioner's corporate secretary. Mrs. Ginger had no role with petitioner other than being a member of the board and the corporate secretary.

Ginger quickly developed a reputation as an honest and no-nonsense operator. Immediately after forming petitioner, Ginger negotiated with vendors and asked them to help finance petitioner's purchases. If petitioner was out of cash, Ginger would call the owner of the creditor company, tell him that petitioner could not pay the bill that month, and explain what was being done to remedy the situation.

B. Ginger's Strategy When He Formed Petitioner

While working for other contractors, Ginger noticed that the masonry business was divided into contractors that worked on commercial projects and contractors that worked on residential projects. The commercial masonry contractors were large companies that handled the large commercial jobs, such as high-rise buildings, office buildings, and shopping centers. The commercial masonry contractors were very professional. They had solid reputations and had established working relationships with the large developers overseeing the commercial construction projects.

The residential masonry contractors, on the other hand, consisted of mostly smaller companies that bid on projects in a very limited geographic area. These contractors did not have working relationships with the developers. Competition for jobs was stiff, and the contractors would try and squeeze as much profit from a job as possible, and often quality would suffer as a result.

Ginger developed a strategy that would enable petitioner to penetrate the residential masonry market. Ginger wanted to enter that market with the same professionalism found in commercial masonry. Ginger wanted to avoid an adversarial posture between petitioner and the customers (i.e., the developers). Rather, he wanted to work with the developers to make sure that they were satisfied with petitioner's work. Ginger reasoned that if

petitioner provided high-quality work, the developers would continue to hire petitioner year after year.

Ginger realized that working with the large developers was essential to petitioner's success. The large developers were building entire housing tracts, and they were the most reliable source for a steady volume of masonry projects. Ginger also realized that, in order to work with large developers, petitioner would need a lot of equity to meet its operating expenses. Ginger knew that some large developers would wait 90 to 100 days before paying the masonry contractor. The large developers wanted contractors on the job that could complete the project, on time, without problems. As a result, the developers avoided contractors with insufficient resources. Ginger consulted with petitioner's accountant, Gary Christenson (Christenson). Christenson advised Ginger that petitioner would have to accumulate substantial amounts of working capital and maintain strong financial statements before it could work with the large developers. Thus, in the years 1985 through 1989, Ginger's first priority was to grow petitioner to an acceptable size; to this end, he took less compensation in order to speed the process of reaching petitioner's capitalization goals.

Ginger's insight proved accurate, and petitioner began to develop a good reputation among the residential developers. After winning the trust of the residential developer, the developer would often contact Ginger directly to get a

preliminary cost estimate. The developer would use the preliminary estimate to develop a budget on a project. In essence, Ginger served as consultant to the residential developer, providing information such as the type of products the developer should use or a cost-saving approach to a problem.

When the preliminary work was finished and the job was set to go forward, the residential developer would want petitioner to get the job because Ginger already was familiar with it. As a result, the residential developer would be more lenient with petitioner in the bidding process than might otherwise be the case. This proved crucial to petitioner's success because it gave Ginger the opportunity to negotiate a final bid with the developer. This was not standard practice in the industry. Typically, the subcontractor submitting the lowest bid would get the job, but petitioner generally was not the lowest bidder. In fact, Ginger did not want petitioner to be the lowest bidder. Because of Ginger's good working relationship with the developers, they were willing to pay petitioner a premium since they trusted that Ginger would deliver superior quality and service. Ginger considered this a key to petitioner's success.

Once petitioner began working with the large developers, Ginger took advantage of economies of scale and negotiated excellent terms on the purchase of materials. Petitioner grew and developed a backlog of pending projects equal to 3-5 months of work. The backlog helped petitioner retain quality workers

because they knew that a steady supply of work existed. The ability to maintain experienced crews enabled petitioner to deliver the highest quality masonry work.

C. Petitioner's Operations

Petitioner typically became involved in a job when the developer called Ginger directly. Ginger would go to the developer's office, review the plans, discuss the details for the job, and suggest cost saving alternatives. Ginger would then take the plans to his office and review the plans with petitioner's estimator, Gary Sawhill (Sawhill).

Ginger and Sawhill would work through the plans and come up with a bid. Ginger assisted Sawhill with matters such as profit percentages, overhead, cost of labor, material cost, production rates, and anything out of the ordinary. On an annual or semiannual basis, Ginger would set the appropriate rates that petitioner would use to bid a job. During the recession in 1990-92, Ginger revised petitioner's rates every quarter.

Sawhill used the current figures to calculate the bid, which was then given to Ginger. Ginger reviewed the entire bid before it was sent to the developer. After the bid was submitted, Ginger contacted the developer and offered to discuss the bid further if the developer believed it to be too high. This often would lead to further negotiations between the developer and Ginger.

When a developer accepted a bid, Ginger provided petitioner's superintendent with the details of the job. On a small job, only one person would travel to the jobsite, and that would be the job foreman. The foreman would travel to the site with his equipment and his materials and complete the job. On larger jobs, the foreman would oversee a crew on the jobsite.

During the fiscal years 1990 through 1992, petitioner employed approximately 80 to 100 people and had as many as 150 jobs in progress at any given time. Ginger separated petitioner's operations into two categories: Brick and stone masonry and block masonry. Ginger employed a superintendent on the block masonry side of the business. The superintendent would visit the jobsites, talk with the job foreman, see how the work was progressing, and then report the progress to Ginger at the end of the day. Since 1990, Steve Adams (Adams) has been the superintendent of petitioner's block masonry division. Until 1992 or 1993, Ginger, himself, worked as the superintendent on the brick and stone masonry side of the business.

Although the superintendent or foreman supervised the job once work began on the jobsite, Ginger resolved any significant problems that developed on the jobsite, such as quality, manpower, labor, etc. When a significant problem developed, typically the developer would contact Ginger directly, and Ginger resolved the problem.

As for hiring, Ginger had sole authority over whether the company needed a new employee. Petitioner had very low turnover, and Ginger discouraged hiring additional staff because he wanted to keep overhead as low as possible. Every applicant completed an application and a health screening. Ginger frequently made the final hiring decision, but Adams also had the authority to hire a new employee who would be working on a site that he supervised. Adams had the authority to fire new employees working on the sites that he supervised. He did not, however, have the authority to fire an established employee. Ginger decided whether to fire an established employee.

During the years in issue, Cheri Lawrence (Lawrence), Ginger's sister, worked as petitioner's bookkeeper. She does not have a degree in accounting. Lawrence entered the accounts payable and accounts receivable, prepared quarterly reports submitted to the Internal Revenue Service, and made entries into the general ledger. Lawrence reviewed the financial statements for accuracy, but she did not set petitioner's financial policy. Kay Peterson (Peterson), Ginger's mother, worked as an office manager and paid minor expenses, such as utilities, phone, and office supplies. Peterson and Ginger were the only persons with signatory authority on petitioner's checking account.

Ginger made all of petitioner's financial decisions and set financial policy. The bookkeeper entered the numbers, and, with Ginger's help, assembled a monthly report. Ginger reviewed the

accounting and bookkeeping work, in addition to all of the estimates for jobs over $1,000. Ginger personally reviewed any invoice over $200. Ginger would interpret the contracts for work in progress, verify the amount of work actually completed, and assemble a rough draft of the invoice. Ginger reviewed the final draft of every invoice. If a change order was required, Ginger was the one who told the developer that the project was going to cost more money.

Ginger made all compensation decisions, and petitioner paid its employees above the market rate in an attempt to reduce turnover. Ginger made all decisions regarding the use of accountants, lawyers, and other professionals. Ginger handled all financial management and credit management. Ginger considered petitioner's cash flow crucial to survival, and he managed the collection of past due invoices on a daily basis. Every month Ginger would sit down with the bookkeeper and review every job in progress. Ginger typically worked 13 hours a day, and, at times up to 15.5 hours a day. Ginger served as petitioner's only marketing person, and he often spent his weekends and evenings building relationships with customers or potential customers. Ginger joined and participated in local organizations related to the construction industry in an attempt to generate business for petitioner. He also joined organizations that gave him access to executives and entrepreneurs from other industries.

Petitioner's financial statements reflect the following:

| FYE June 30 | Revenue | Gross Profit | Net Income | Retained Earnings |
|---|---|---|---|---|
| 1985 | $3,727,655 | 1,098,482 | 256,644 | 256,644 |
| 1986 | 4,817,376 | 1,037,224 | 66,943 | 323,587 |
| 1987 | 5,427,047 | 1,428,669 | 230,224 | 553,811 |
| 1988 | 5,162,114 | 1,247,098 | 245,153 | 798,964 |
| 1989 | 8,607,196 | 2,293,224 | 549,984 | 1,279,427[1] |
| 1990 | 8,937,324 | 2,063,142 | 18,063 | 1,297,490 |
| 1991 | 5,012,347 | 929,136 | (149,901) | 1,147,589 |
| 1992 | 6,995,774 | 1,429,611 | 22,726 | 1,170,315 |

Petitioner has never paid dividends. Ginger's total compensation was as follows:

| FYE June 30 | Total Compensation | Disallowed by Respondent | Allowed by Respondent |
|---|---|---|---|
| 1985 | $249,145 | -- | -- |
| 1986 | 383,290 | -- | -- |
| 1987 | 390,724 | -- | -- |
| 1988 | 280,000 | -- | -- |
| 1989 | 516,371 | -- | -- |
| 1990 | 1,069,001 | 818,756 | 250,245 |
| 1991 | 132,000 | -- | 132,000 |
| 1992 | 396,698 | 186,825 | 209,873 |

Petitioner's shareholders' equity, as contained in petitioner's financial statements, is as follows:

| FYE June 30 | Shareholders' Equity |
|---|---|
| 1985 | $271,644 |
| 1986 | 338,587 |
| 1987 | 568,811 |
| 1988 | 813,964 |

---

[1] Due to an error in recording, the June 30, 1989, retained earnings figure was restated on June 30, 1990, from $1,348,948 to $1,279,427.

| | |
|---|---|
| 1989 | 1,294,427[2] |
| 1990 | 1,312,490 |
| 1991 | 1,162,589 |
| 1992 | 1,185,315 |

Petitioner claimed deductions for officer's compensation in the amounts of $1,069,001 and $396,698 for the fiscal years 1990 and 1992, respectively.

D. Others Familiar With Petitioner

Christenson, petitioner's accountant, assisted in the formation of petitioner in 1984, and his accounting firm has reviewed petitioner's financial statements since 1985. Approximately 90 percent of Christenson's clients are in the construction industry.

Christenson considered Ginger the sole marketing person for petitioner, and he characterized Ginger's sales and marketing abilities as "amazing". Christenson noticed that Ginger had an "intuition" in matters, such as profitability, overhead management, and the need to maintain volume to break even. Ginger was a rare client in that he invited Christenson to economic forecast luncheons.

Petitioner's banker, Greg Adamson (Adamson), talked with petitioner's vendors, customers, and competitors. Such contacts were common during Adamson's management of a client's portfolio. Adamson concluded that petitioner had a very solid reputation in

---

[2] We have adjusted the shareholders' equity figure for the fiscal year ended June 30, 1989, to account for the recording error entered supra note 1.

the industry. With respect to profitability, petitioner ranked near the top of Adamson's client portfolio. Adamson considered petitioner to be a high performer with gross profit margins often exceeding 20 percent.

Rick Muth (Muth), an owner of Orco Block Co., characterized Ginger's sales and marketing expertise as "outstanding". Muth considered petitioner a low credit risk, and he ranked petitioner at the top of its field in quality.

E. The Recession

In late 1989 and early 1990, economic experts had predicted a slowdown in the construction industry with a corresponding "soft landing" for the Southern California residential housing market. There was no soft landing. Petitioner did well through July of 1990, and then in August 1990 petitioner's business "fell apart".

In August 1990, the California housing market suffered a severe setback. When this happened, petitioner's customers, the large housing developers, reevaluated their positions. Ginger estimated that 50 to 60 percent of petitioner's substantial contract backlog that existed in July of 1990 was canceled within 60 days. Developers called Ginger about building contracts already entered into by petitioner. The developers told Ginger that the jobs were canceled unless petitioner would lower its bids by 8 to 10 percent. Ginger renegotiated his material purchases and slashed his bid prices just to stay in business.

Petitioner's strength revealed itself during the economic slowdown.  Ginger had aligned petitioner with the large developers, the most likely candidates to build during the downturn.  By this time, however, bid prices were critical in obtaining work.  Ginger studied the jobsites of his competitors and talked to their customers and suppliers in an attempt to determine whether a competitor could bid a lower price than petitioner.  These were additional duties that Ginger took on as a result of the economic slowdown.  In addition, Ginger reviewed an industrywide credit report that indicated whether petitioner's competitors were experiencing credit problems.

Many other construction-related companies lost business during the fall of 1990 and some went out of business entirely.  John Connors (Connors), vice president of a construction materials supply company, held an emergency meeting with the executives of his company in September 1990 to address the economic downturn.  Connors' stores suffered a 40-percent to 60-percent drop in sales.  Connors' company reduced its staff from 145 to 80 and reduced salaries across the board by 10 percent.

OPINION

Section 162(a)(1) allows a corporation to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered" as a business expense.  To come within the ambit of section 162(a)(1), the compensation must be both reasonable in amount and in fact paid purely for

services.  Sec. 1.162-7(a), Income Tax Regs.  Although framed as a two-prong test, the inquiry under section 162(a)(1) has generally turned on whether the amounts of the purported compensation payments were reasonable.  Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243-1244 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282.  What constitutes reasonable compensation to a corporate officer is a question of fact to be determined on the basis of all the facts and circumstances of a case.  Pacific Grains, Inc. v. Commissioner, 399 F.2d 603, 605 (9th Cir. 1968), affg. T.C. Memo. 1967-7.  Petitioner has the burden of proving that the payments to Ginger were reasonable. Rule 142(a).  Respondent has conceded that petitioner is entitled to a deduction for compensation paid to Ginger in the amounts of $300,000 and $209,873 for the fiscal years 1990 and 1992, respectively.

Many factors are relevant in determining the reasonableness of compensation, and no single factor is decisive.  Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court.  The Court of Appeals for the Ninth Circuit has divided the factors relevant to the reasonable compensation determination into the following five broad categories for analytical purposes.

1. Roles in Company

The first category of factors identified by the Court of Appeals for the Ninth Circuit concerns the employee's role in the company.  Relevant considerations include Ginger's qualifications, hours worked, duties performed, as well as his general importance to petitioner's success.  American Foundry v. Commissioner, 536 F.2d 289, 292-293 (9th Cir. 1976), affg. in part and revg. in part 59 T.C. 231 (1972).

Ginger was a highly motivated employee working as much as 15.5 hours a day.  His evenings and weekends were often spent marketing petitioner's services to existing customers and potential customers.

Despite his lack of formal business training, Ginger acquired the skills necessary to manage every facet of petitioner's operations.  He attended economic forecast luncheons.  He joined organizations that gave him access to other business executives and entrepreneurs, and he sought advice from these individuals.

Ginger handled all of petitioner's executive and managerial duties.  Other employees assisted Ginger, but petitioner had no other managers or executives.  Ginger received assistance in the areas of bookkeeping, field supervision, and estimating, but that assistance extended only to routine matters.  Ginger devised and implemented petitioner's corporate strategy of targeting the large residential developers.  Ginger's financial discipline and marketing abilities brought petitioner's corporate strategy to

fruition.  Ginger reviewed all of petitioner's expenditures, ensured low overhead, resisted adding new employees, and insisted that petitioner grow through retained earnings.  Ginger continually marketed petitioner's services.  Ginger's sales and marketing abilities were described as "amazing" and "outstanding".  Petitioner grew steadily from its inception in 1984, weathered the economic downturn in 1991, and began a recovery in 1992.  Ginger served as the catalyst for petitioner's growth and success.

## 2. External Comparison

We also compare the employee's salary with the salaries paid by similar companies for similar services.  Sec.1.162-7(b)(3), Income Tax Regs.  Both parties offered expert testimony as to what a like company would pay for like services.  Both experts considered surveys of financial data on numerous organizations, including developers, builders, residential building contractors, and construction contractors in specialty trades.

### a. Respondent's Expert

Respondent presented expert testimony from Scott D. Hakala (Hakala).  Hakala reviewed the surveys of financial data and concluded that it was not very "satisfying".  As a result, he relied less on the market data than he would prefer for the final conclusion.  Instead, Hakala derived a formula to calculate Ginger's compensation; the formula does incorporate one aspect of the survey data.

Hakala's formula consists of a base salary of $90,000 increasing at a nominal rate of 2 percent for each year of the term, plus a variable component equal to 20 percent of operating income before officers' compensation.

As for the base salary figure, Hakala used data on contractor executive compensation compiled by Personnel Administration Services (PAS survey). Hakala felt the PAS survey was the most accurate under the circumstances of this case. Hakala used the median, 50th percentile, salary of $144,000, and broke this down into a median base salary of $90,000 plus a $54,000 bonus. Hakala explained that $90,000 is the median base salary for someone working in a firm with between $5 million and $20 million in sales on the west coast. For companies in the 75th percentile, compensation climbed to $200,000. The top officer also received additional benefits with a cash value of up to $50,000.

As for the variable component, the 2-percent figure accounts for the slow growth in the real estate market in addition to an inflation factor. Hakala calculated the 20-percent bonus figure using financial projections for 1993 and 1994 and an intended return on equity. Hakala concluded that 20 percent was "the most bonus" the executive could be paid and still allow some kind of reasonable return expectation to the shareholder. Hakala opined that Ginger's compensation for the fiscal years ended June 30,

1990 and 1992 should be no more than $300,000 and $200,000, respectively.

Hakala also opined that a median compensation for the second highest corporate officer for companies in the building trades was $100,000, while compensation at the 75th percentile was $129,000.  The second highest corporate officer also received additional benefits with a cash value slightly under $30,000.

### b. Petitioner's Expert

Petitioner presented the testimony of Sidra Wieder (Wieder), who specializes in employee compensation and employee benefits. Wieder focused on the duties performed by Ginger as well as the duties performed by petitioner's other employees.  Wieder specifically reviewed Ginger's responsibilities and scope of authority.  Two of the factors Wieder used to determine Ginger's compensation were the payroll amounts that petitioner saved by having Ginger serve many roles and the amount that Ginger should be paid for the various duties he performed for petitioner. Wieder concluded that Ginger served as petitioner's chief executive officer, chief operations/administrative officer, and marketing executive.  Wieder concluded that Ginger also served as petitioner's chief financial officer.  She did not, however, include the chief executive officer as a separate position because she concluded that those duties would be subsumed within Ginger's other executive duties.  Based on the data reviewed by Wieder, she opined that the total compensation paid to a

comparable company's chief executive officer, chief operations/administrative officer, and marketing executive ranged between $476,949 and $1,910,740 in 1990 and between $555,029 and $776,349 in 1992. Wieder opined that the compensation petitioner paid Ginger in 1990 and 1992 was reasonable.

### c. Discussion

Respondent and respondent's expert have understated the services provided by Ginger and have overstated the services provided by Sawhill, Lawrence, Peterson, and Adams. Respondent contends that the latter individuals were responsible for petitioner's day-to-day operations. We do not agree with respondent's characterization. The record indicates that Ginger played the crucial role in petitioner's operations. Sawhill, Lawrence, and Peterson completed relatively routine matters that Ginger had delegated to them. They discussed anything out of the ordinary with Ginger. Adams had limited authority over the jobsites that he supervised, including the authority to hire and terminate new employees on those sites. Ginger made all other personnel decisions.

Petitioner did not have a strong managerial infrastructure other than Ginger. Ginger effectively performed the roles of chief executive officer, chief financial officer, chief operations/administrative officer, and marketing executive. Ginger's compensation should reflect the combined salaries of the

job positions he performed. <u>Elliotts, Inc. v. Commissioner</u>, 716 F.2d at 1246.

## 3. Character and Condition of Company

This factor requires us to focus on petitioner's size as indicated by its sales, or capital value, the complexities of the business, and the general economic conditions. <u>Elliotts, Inc. v. Commissioner</u>, <u>supra</u> at 1246. In a relatively short time, petitioner became a top performer in a highly competitive market. Petitioner maintained a high gross profit ratio. Petitioner penetrated the residential masonry market and won contracts with some of the largest residential developers in the area. Furthermore, petitioner survived the economic downturn that began in 1990. Petitioner's survival was due, in part, to its financial strength and its ability to obtain work in a declining market. Ginger was the architect of petitioner's growth strategy, and he provided the tools necessary to implement that strategy. Ginger also charted petitioner's path through the economic decline.

## 4. Conflict of Interest

The primary issue in considering factors indicating a conflict of interest is whether some relationship exists between the company and the employees which might permit the former to disguise nondeductible corporate distributions of income as salary expenditures deductible under section 162(a)(1). "Such a

potentially exploitable relationship may exist where, as in this case, the * * * [employees are] the taxpaying company's sole or controlling shareholder[s]".  Elliotts, Inc. v. Commissioner, supra at 1246.

The relationship in this case, where Ginger and his wife were petitioner's sole shareholders, warrants scrutiny.  Id.  The mere existence of such a relationship, coupled with an absence of dividend payments, however, does not necessarily lead to the conclusion that the amount of compensation is unreasonably high.  Id.  They are relevant factors but are not to be viewed in isolation.  Id. at 1247.  Furthermore, we shall not presume a disguised dividend from the bare fact that a profitable corporation does not pay dividends.  Id. at 1244; Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1326-1327 (5th Cir. 1987), affg. T.C. Memo. 1985-267.

The Court of Appeals for the Ninth Circuit formulated the inquiry in such a situation by evaluating the compensation payments from the perspective of a hypothetical independent investor.  The prime indicator is the return on its investors' equity. Owensby & Kritikos, Inc. v. Commisisoner, supra at 1326-1327.  If the company's earnings on equity after payment of the compensation remain at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary.  Elliotts, Inc.

v. Commissioner, supra at 1247.  The Court of Appeals for the
Ninth Circuit, in Elliotts, Inc., calculated the return on equity
using the yearend shareholder's equity.  We follow that approach.
See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. on another
issue 445 F.2d 985 (10th Cir. 1971).  Dividing petitioner's net
profit (after payment of compensation and a provision for income
taxes) by the yearend shareholders' equity, as reflected in its
financial statements, yields the following:

| FYE June 30 | Percentage Return on Equity |
|---|---|
| 1985 | 94 |
| 1986 | 20 |
| 1987 | 40 |
| 1988 | 30 |
| 1989 | 42 |
| 1990 | 1 |
| 1991 | (13) |
| 1992 | 2 |

Under the circumstances of this case, we find that the
return on equity for the years at issue (1990-92) is not a
reliable indicator of the reasonableness of Ginger's
compensation.  See Elliotts, Inc. v. Commissioner, supra at 1247
n.5.  We doubt that the 1-percent return on equity for the year
ended June 30, 1990, would satisfy an independent investor;
however, there is probative evidence that Ginger had forgone
compensation in prior years in an attempt to enlarge petitioner's

capital base in order to satisfy the demands of the large developers.  Increasing petitioner's capital base in the early years was central to petitioner's ability to penetrate the residential masonry market.  Indeed, the percentage return-on-equity figures for the years 1985 through 1989 indicate that petitioner could have paid additional officer compensation and maintained a satisfactory return on equity.  Under these circumstances, isolating the return-on-equity figure for the fiscal year ended June 30, 1990, would ignore petitioner's successful corporate strategy and the steps taken to implement that strategy.

The percentage return-on-equity figures for the years 1991 and 1992 must be viewed in light of the precipitous drop in the residential housing market in late 1990.  Given the severity of that economic decline, the return-on-equity figures are not a good indicator of petitioner's performance or the reasonableness of compensation that petitioner paid Ginger.

5. Internal Consistency

Internal inconsistency in petitioner's treatment of payments to employees may indicate that the payments to Ginger were not reasonable.  Elliotts, Inc. v. Commissioner, 715 F.2d at 1247.  Bonuses that have not been awarded under a formal and consistently applied program are suspect.  Nor-Cal Adjusters v. Commissioner, 503 F.2d 359, 362 (9th Cir. 1974), affg. T.C. Memo.

1971-200.  However, it is permissible to pay and deduct compensation for services performed in prior years.  <u>Lucas v. Ox Fibre Brush Co</u>., 281 U.S. 115, 119 (1930).

### a. Compensation for Services in Prior Years

Financial stability was a crucial element in petitioner's growth strategy.  Ginger knew that petitioner would need strong financial statements and considerable equity in order to work with the large developers.  To this end, Ginger received less compensation in years prior to the years in issue.  Petitioner, as a result, retained a significant portion of its earnings and increased its equity base.  After petitioner reached its financial goals and secured a working relationship with the large developers, petitioner compensated Ginger for the extraordinary services he provided petitioner from 1984 to 1989.

### b. Compensation Paid to Other Employees

Wieder concluded that petitioner's other employees, such as superintendent, bookkeeper, and administrative assistant, were all paid above-average compensation from 1986 to 1992 with above-average pay increases most of those years.  Hakala concluded that petitioner's other employees, specifically Sawhill and Adams, were undercompensated.  Hakala opined that an estimator, Sawhill's position, would earn $70,000 and up to $100,000 in a very good year.  Included in the $100,000 figure is a bonus of up

to $20,000. Hakala opined that Adams' compensation in 1990 should have exceeded $70,000, which it did not.

As explained above, respondent has attributed to petitioner's other employees services actually performed by Ginger. Ginger filled the critical roles in petitioner's operations. Ginger worked closely with Sawhill. Sawhill performed the calculations necessary to produce a bid, but Ginger determined the substantive financial data that was incorporated into a bid, such as profit percentages, overhead, cost of labor, material cost, and production rates. The accuracy of the substantive financial data was essential to petitioner's profitability. After petitioner submitted a bid, Ginger contacted the developer and negotiated an agreement. When discussing hours worked by various employees, Hakala stated that the marketing and salesperson is usually the estimator. But this was not the case with petitioner. Ginger served as petitioner's marketing and salesperson.

Adams served as the superintendent on the block masonry side of petitioner's business. However, Ginger resolved significant problems on all of the jobsites, including the sites supervised by Adams. Indeed, when a significant problem developed on one of petitioner's jobsites, the developer typically would contact Ginger directly. Ginger, himself, worked as the superintendent on the brick and stone masonry side of the business.

Ginger served as the central figure in petitioner's growth and success. Ginger effectively discharged the responsibilities of several corporate executives. He did so through long hours, consultation with others, and efficient use of petitioner's other employees. Petitioner's success was due to Ginger's significant efforts and contributions, and we conclude that the compensation paid to Ginger during the years in issue was reasonable.

To reflect the foregoing,

<u>Decision will be entered under Rule 155</u>.