T.C. Memo. 1997-360

UNITED STATES TAX COURT

TRICON METALS & SERVICES, INC., Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4963-95.                    Filed August 6, 1997.

<u>Joseph G. Stewart</u>, <u>Abbot Brand Walton, Jr.</u>, and <u>David A.
Elliott</u>, for petitioner.

<u>Robert W. West</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

KÖRNER, <u>Judge</u>:  Respondent determined the following
deficiencies in petitioner's Federal income taxes:

| FYE Aug. 31 | Deficiency |
|---|---|
| 1990 | $173,346 |
| 1991 | 226,072 |
| 1992 | 326,591 |

The issue for decision is whether the compensation paid to petitioner's majority shareholder in its fiscal years ending 1990, 1991, and 1992 is deductible by petitioner as reasonable compensation under section 162(a)(1).  We hold that it is to the extent stated herein.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

FINDINGS OF FACT

We incorporate by reference the stipulation of facts and attached exhibits.  Tricon Metals & Services, Inc. (petitioner), is an Alabama corporation whose principal place of business was Jefferson County, Alabama, when the petition was filed. Petitioner operates on a fiscal year ending August 31.

1.  Petitioner

Petitioner buys, warehouses, and sells high-strength steel products.  Petitioner's founders, James L. Bell (Bell), Walter H. Ferguson (Ferguson), and W. Warren Wood (Wood), worked as salesmen for other companies in the steel business prior to organizing petitioner.

Bell, Ferguson, and Wood organized petitioner in November 1968, and they each owned one-third of petitioner's outstanding shares of stock. Initially, Bell, Ferguson, and Wood served as petitioner's entire sales force, and each one was responsible for a particular sales territory. In its first full year of operation, petitioner employed six people, which included the three founders, had gross sales of $225,199, and had net income after taxes of $14,838.

Petitioner prospered in the 1970's. It soon outgrew the rented warehouse where its operations began and moved to a warehouse and office facility in Irondale, Alabama, a suburb of Birmingham. By the end of 1979, petitioner employed 33 people and had gross sales of $4,455,133.

In 1979, Bell and Ferguson discovered that Wood had organized a corporation in Jacksonville, Florida, to compete with petitioner. At the time, Wood was still an officer, director, and employee of petitioner. Bell and Ferguson, as a majority of petitioner's board of directors, fired Wood and sued him for breach of fiduciary duty. Wood counterclaimed against petitioner, and they eventually settled the litigation. Although Wood's employment with petitioner was terminated, he remained a shareholder. From 1979 through January 1988, Wood owned approximately 33 percent of petitioner's outstanding shares of stock.

After Bell and Ferguson discovered that Wood had organized a competitor, they established a salary structure for themselves based on a percentage of petitioner's net sales. Bell, who was serving as petitioner's president at the time, was to receive 2.4 percent of petitioner's net sales. Ferguson, who was serving as petitioner's vice president, was to receive 1.6 percent of petitioner's net sales.

2.  Petitioner's Operations

During most of the 1980's, Bell and Ferguson were officers of petitioner, sharing administrative duties and acting as commissioned salesmen. Bell had served as petitioner's president since 1974. In 1987, Bell became ill with cancer, and he died in January 1988. Petitioner redeemed Bell's stock pursuant to a buy-sell agreement executed by the founders in April 1970.

After Bell's death, Ferguson became president of petitioner. Ferguson's salary as president was set at 2.6 percent of net sales.

In 1988, Wood filed a lawsuit against petitioner and Ferguson in an unsuccessful attempt to gain control of petitioner. At the time, Wood owned just over 40 percent of petitioner's outstanding shares of stock, and Ferguson owned just over 50 percent of petitioner's outstanding shares of stock. In response to Wood's lawsuit, petitioner and Ferguson entered into a 5-year employment agreement (employment agreement) to protect Ferguson in the event that Wood gained control of petitioner.

Pursuant to the employment agreement, Ferguson's salary was set at 2.4 percent of net sales, the same percentage of net sales that Bell had received prior to his death.

Wood's attempt to gain control of petitioner proved unsuccessful, and after his defeat, Wood agreed to sell his stock to petitioner. On August 1, 1990, Wood sold his stock to petitioner for $2,850,000. After petitioner purchased Wood's stock, Ferguson remained petitioner's majority shareholder, owning approximately 75 percent of petitioner's outstanding stock.

3. Petitioner's Financial Condition

Petitioner's financial statements reflect the following:

| FYE Aug. 31 | Net Sales | Gross Profit | Net Income | Retained Earnings |
|---|---|---|---|---|
| 1981 | $6,064,513 | $1,638,818 | $321,150 | $1,695,161 |
| 1982 | 7,712,496 | 2,047,589 | 351,329 | 2,046,490 |
| 1983 | 8,180,434 | 2,313,607 | 419,665 | 2,466,156 |
| 1984 | 10,671,010 | 2,981,037 | 701,574 | 3,167,731 |
| 1985 | 11,423,805 | 3,143,870 | 563,557 | 3,731,288 |
| 1986 | 12,456,296 | 3,115,873 | 488,573 | 4,219,862 |
| 1987 | 13,969,335 | 3,904,553 | 714,492 | 4,986,195[1] |
| 1988 | 17,394,166 | 5,053,862 | 861,683 | 7,290,755[2] |
| 1989 | 20,895,754 | 5,012,259 | 1,013,195 | 6,515,293 |
| 1990 | 25,219,920 | 6,410,305 | 1,698,764 | 8,235,846 |
| 1991 | 24,769,390 | 6,591,585 | 1,564,964 | 6,957,810 |
| 1992 | 25,031,040 | 7,926,605 | 2,152,121 | 9,109,931 |

[1] Due to an accounting adjustment, the 1987 retained earnings figure was restated from $4,934,355 to $4,986,195.

[2] This figure is set forth in the financial statements for the period Aug. 31, 1987, through Aug. 31, 1988. Subsequent financial statements show this figure as $7,290,577. This discrepancy does not affect our analysis.

Petitioner's shareholders' equity is as follows:

| FYE Aug. 31 | Shareholders' Equity |
|---|---|
| 1981 | $1,719,074 |
| 1982 | 2,070,404 |
| 1983 | 2,490,070 |
| 1984 | 3,191,644 |
| 1985 | 3,755,202 |
| 1986 | 4,243,775 |
| 1987 | 4,958,268 |
| 1988 | 5,523,189 |
| 1989 | 7,260,559 |
| 1990 | 6,251,019 |
| 1991 | 7,815,983 |
| 1992 | 10,163,504 |

Petitioner has never paid dividends.

In the 1970's, petitioner and its shareholders borrowed funds to expand petitioner's facilities. The terms of the financing arrangement prohibited petitioner from paying dividends to its shareholders. In 1985, and again in 1987, petitioner entered into a bond guaranty agreement (guaranty agreement) with AmSouth Bank N.A. in connection with another expansion of petitioner's facilities. The guaranty agreement was operative through 1992, and it prohibited petitioner from paying dividends to its shareholders while the bonds were outstanding.

4. Ferguson's Executive Duties

Ferguson became petitioner's president and chief executive officer (CEO) in 1988, after Bell's death. After becoming CEO, Ferguson continued to serve as petitioner's treasurer. In November 1988, petitioner created two additional vice president positions, for a total of three vice presidents, and the three

vice presidents assisted Ferguson in managing petitioner's operations. Ferguson supervised the vice presidents.

Ferguson was a hands-on chief executive. He played a role in purchasing and personnel decisions, although petitioner had other employees that also worked in these areas. Ferguson played a major role in selecting Elko, Nevada, as the site for petitioner's western operations. Petitioner opened the Elko, Nevada, site in June 1989. Ferguson also oversaw petitioner's expansion into foreign markets such as Mexico, South America, Canada, and Indonesia.

5. Ferguson's Sales Duties

During the years in issue, petitioner employed between 22 and 26 salesmen. Petitioner had two regional sales managers, one that covered the Western United States and one that covered the Northeastern United States.

After becoming CEO, Ferguson continued to serve petitioner as a salesman. Ferguson's sales territory included southern Alabama, Mississippi, and much of Louisiana. Ferguson personally made sales calls to existing customers in his sales territory, as well as any new customers within his territory. Like all of petitioner's salesmen, Ferguson's sales duties forced him to travel, at times, up to 4 days a week. Ferguson, like the other salesmen, received a commission on the sales he generated.

One crucial role that Ferguson filled was keeping petitioner's super salesmen together. These were petitioner's top performing salesmen, and they were extremely valuable employees. Ferguson personally supervised 10 of petitioner's top performers. The top performers could call Ferguson with a problem any time, 7 days a week. Ferguson, in his capacity as sales manager, received a commission on the sales generated by the 10 salesmen that he supervised.

6. Ferguson's Compensation

Petitioner's management team set salaries and bonuses after consulting with Louis Paul Kassouf (Kassouf). Kassouf has been a certified public accountant since 1954, and he served as petitioner's accountant from 1970 through the years in issue. Kassouf consulted with petitioner on audit issues, corporate tax planning, compensation, and tax return preparation.

When Ferguson took over as petitioner's president after Bell's death, initially his salary was 2.6 percent of net sales. Ferguson then entered into the employment agreement with petitioner which set Ferguson's salary at 2.4 percent of net sales. Kassouf had recommended a salary for Ferguson in excess of 2.4 percent of net sales. Kassouf reasoned that Ferguson, in addition to his existing duties, would be adding the duties previously handled by Bell. However, Ferguson did not perform all of the duties previously handled by Bell.

In addition to salaries, petitioner paid bonuses to its executives. Petitioner had no formal program for awarding bonuses. Petitioner's management team would meet with Kassouf in August, the month that petitioner's fiscal year closed, to determine the bonuses to be paid. After considering petitioner's performance and the effort put forth by the various employees, Kassouf would recommend what he felt were reasonable bonuses for the various employees. In 1990 and 1991, Kassouf recommended a bonus for Ferguson slightly larger than the bonus that petitioner paid Ferguson. The bonus that Ferguson received during the fiscal year ending 1992 was for services rendered during that year.

Ferguson received the following fringe benefits:[3]

| Item | 1990 | 1991 | 1992 |
|------|------|------|------|
| Contributions to profit sharing plan | $11,352 | $5,064 | $8,849 |
| Medical insurance | 222 | 247 | 275 |
| Life insurance | 13,915 | 13,915 | 22,063 |
| Disability insurance | 1,056 | 1,056 | 1,056 |
| Automobile | 10,206 | 9,091 | 5,856 |
| Club dues | 3,282 | 3,462 | 3,462 |
| Total | 40,033 | 32,835 | 41,561 |

Ferguson's compensation (salary, sales commission, and bonus) was as follows:

---

[3] For purposes of this opinion, we use the term "compensation" to refer to Ferguson's salary, sales commission, and bonus. We take the fringe benefits into account as a factor in determining whether that compensation was reasonable.

| FYE Aug. 31 | Salary | Sales Commissions | Bonus | Total Compensation | Conceded by Respondent |
|---|---|---|---|---|---|
| 1990 | $441,104 | $167,493 | $100,000 | $708,597 | $550,000 |
| 1991 | 603,926 | 139,392 | 120,000 | 863,318 | 600,000 |
| 1992 | 610,459 | 117,364 | 430,000 | 1,157,823 | 750,000 |

OPINION

Section 162(a)(1) allows a corporation to deduct "a reasonable allowance for salaries or other compensation for personal services actually rendered" as a business expense. To come within the ambit of section 162(a)(1), the compensation must be both reasonable in amount and in fact paid purely for services. Sec. 1.162-7(a), Income Tax Regs. Although framed as a two-prong test, the inquiry under section 162(a)(1) generally has turned on whether the amounts of the purported compensation payments were reasonable. Elliotts, Inc. v. Commissioner, 716 F.2d 1241, 1243-1244 (9th Cir. 1983), revg. and remanding T.C. Memo. 1980-282. What constitutes reasonable compensation to a corporate officer is a question of fact to be determined from all the facts and circumstances of a case. Charles Schneider & Co. v. Commissioner, 500 F.2d 148, 151 (8th Cir. 1974), affg. T.C. Memo. 1973-130; Estate of Wallace v. Commissioner, 95 T.C. 525, 553 (1990), affd. 965 F.2d 1038 (11th Cir. 1992). Petitioner has the burden of proving that the payments to Ferguson were reasonable. Rule 142(a). Respondent has conceded that petitioner is entitled to a deduction for compensation paid to

Ferguson in the amounts of $550,000, $600,000, and $750,000 for the fiscal years ending 1990, 1991, and 1992, respectively.

Many factors are relevant in determining the reasonableness of compensation, and no single factor is decisive. Charles Schneider & Co. v. Commissioner, supra at 152; Mayson Manufacturing Co. v. Commissioner, 178 F.2d 115, 119 (6th Cir. 1949), revg. a Memorandum Opinion of this Court. The courts have used numerous factors to determine what constitutes reasonable compensation. We address those factors below.

1. Roles in Company

The first category of factors concerns the employee's role in the company. Relevant considerations include Ferguson's qualifications, hours worked, and duties performed, as well as his general importance to petitioner's success. American Foundry v. Commissioner, 536 F.2d 289, 292-293 (9th Cir. 1976), affg. in part and revg. in part 59 T.C. 231 (1972).

Ferguson served as petitioner's CEO and as a salesman. As CEO, Ferguson selected the site for petitioner's operations in the Western United States, and he also oversaw petitioner's international sales. There is no evidence, however, that petitioner's international operations were profitable.

Ferguson supervised three vice presidents that assisted in petitioner's operations. Petitioner has not shown that it engaged in highly technical or complex operations or that Ferguson possessed managerial skills unique to petitioner's

industry. See <u>Miller Box, Inc. v. United States</u>, 488 F.2d 695, 705 (5th Cir. 1974). Indeed, the record supports the finding that sales remained Ferguson's focus during the years in issue.

Ferguson's customer contacts and his familiarity with the steel industry made him a valuable salesman and sales manager. Ferguson traveled, met with clients, and supervised 10 of petitioner's super salesmen. Although the salesmen that Ferguson supervised could contact him in the evenings, as well as on weekends, petitioner presented no evidence that Ferguson worked an inordinate number of hours.

## 2. External Comparison

We also compare the employee's salary with the salaries paid by similar companies for similar services. Sec. 1.162-7(b)(3), Income Tax Regs. Both parties offered expert testimony as to what a like company would pay for like services. Both experts considered surveys of financial data on numerous companies.

### A. Petitioner's Expert

Petitioner presented the testimony of James M. Otto (Otto). Otto compared the compensation paid to the chief executive officers of 12 publicly traded companies to the salary and bonus paid to Ferguson. Otto did not include Ferguson's commissions from sales when determining the reasonableness of Ferguson's compensation as CEO. Otto reasoned that since Ferguson was paid sales commissions on the same commission structure as petitioner's other salesmen and since Ferguson's duties as

salesman were separate and distinct from his duties as CEO, the inclusion of Ferguson's sales commissions in the analysis of Ferguson's compensation as CEO would be inappropriate. Within these parameters, Otto concluded that Ferguson's compensation as CEO was reasonable.

B. Respondent's Expert

Respondent presented expert testimony from David Neil Fuller (Fuller). Fuller reviewed surveys of financial data of other companies, and he also reviewed the compensation paid to executives at nine companies that he considered comparable to petitioner. The nine companies selected by Fuller had revenues that were 15 to 20 times larger than petitioner's revenues, and those companies were not necessarily in a line of business comparable to that of petitioner.

When discussing petitioner's performance, Fuller acknowledged that the U.S. economy was in a recession during the years in issue. Fuller stated that the slow economy had a negative impact on the steel industry in general, yet petitioner suffered less from the recession than did the nine companies that Fuller selected for comparison.

Fuller also acknowledged that Ferguson served as petitioner's CEO and as a salesman. Yet in the compensation analysis, Fuller grouped Ferguson's duties together under the title of CEO. Fuller opined that a range of reasonable compensation for Fuller would be $500,000-$600,000, $550,000-

$650,000, and $700,000-$800,000 for the fiscal years ending 1990, 1991, and 1992, respectively.

C. Discussion

We have not found the opinion of either expert convincing. It is not at all clear that the "comparable" companies used in their analyses are comparable to petitioner. In addition, neither expert focused on the duties that Ferguson actually performed. The appropriate comparison is to the duties the employee actually rendered rather than the titles held. See Trinity Quarries, Inc. v. United States, 679 F.2d 205, 211 (11th Cir. 1982). Thus, the usefulness of their analyses to determine the "amount as would ordinarily be paid for like services by like enterprises under like circumstances" is doubtful. Sec. 1.162-7(b)(3), Income Tax Regs.

Otto testified that he considered the 12 companies he selected to be comparable regarding return on equity and return on assets, but he did not consider the companies necessarily comparable with regard to overall sales or net asset value. Furthermore, several of the companies that petitioner's expert considered comparable to petitioner were conglomerates with several lines of business, only one of which was similar to the business operated by petitioner. We note also that in 1990, Ferguson's total compensation (sales commissions, salary, and bonus) exceeded the compensation paid to each of the CEO's of the 12 companies that petitioner's expert selected as comparable

companies.  In both 1991 and 1992, Ferguson's total compensation (sales commissions, salary, and bonus) exceeded the compensation paid to all but one of the CEO's of the 12 companies that petitioner's expert selected as comparable companies.

We also do not agree with Otto's analysis regarding the division of Ferguson's duties between CEO and salesman.  Otto limited his analysis to Ferguson's duties and compensation as CEO.  Otto testified that the amount of time Ferguson spent as a CEO versus the time he spent as a salesman was irrelevant as long as Ferguson performed the duties required by petitioner.  We are not convinced that Ferguson effectively filled the role of a full-time CEO.  Ferguson spent much of his time serving petitioner as a salesman.

As for respondent's expert, we again question whether the companies selected as comparable companies are indeed comparable. The companies selected by Fuller were not necessarily in petitioner's line of business, and they were not comparable to petitioner in terms of size.  The net sales for the comparable companies selected by Fuller ranged from $50,040,000 to $1,124,130,000 for 1990, $50,260,000 to $1,150,070,000 for 1991, and $42,610,000 to $1,156,200,000 for 1992.  Petitioner's net sales during the years in issue ranged from a low of $24,769,390 in 1991 to a high of $25,219,920 in 1990.

Fuller viewed Ferguson's compensation as a single package without considering Ferguson's sales duties.  The focus should

have been on the duties that Ferguson actually performed, and some weight should have been given to Ferguson's sales ability and his skill in motivating petitioner's super salesmen.

3. <u>Character and Condition of Company</u>

This category of factors requires us to focus on petitioner's size as indicated by its sales, or capital value, the complexities of the business, and the general economic conditions. <u>Elliotts, Inc. v. Commissioner</u>, 716 F.2d at 1246; <u>Pepsi-Cola Bottling Co. v. Commissioner</u>, 528 F.2d 176, 179 (10th Cir. 1975), affg. 61 T.C. 564 (1974).

Petitioner performed well in a competitive business. Respondent's expert indicated that petitioner had done well in terms of growth and profitability during the years in issue. Indeed, Fuller indicated that petitioner's growth and profitability numbers were better than the numbers produced by the companies that Fuller considered comparable to petitioner.

Courts also compare the compensation paid with the gross profit and net income of the corporation. <u>Pepsi-Cola Bottling Co. v. Commissioner</u>, <u>supra</u> at 179. Ferguson's compensation as a percentage of gross profit (before deducting his compensation) is approximately 10 percent, 13 percent, and 15 percent for the fiscal years ending 1990, 1991, and 1992, respectively. Ferguson's compensation as a percentage of net income (before deducting his compensation) is approximately 29 percent, 36 percent, and 35 percent for the fiscal years ending 1990, 1991,

and 1992, respectively. These percentages are reasonable given Ferguson's contribution to petitioner's success during the years in issue.

Courts have considered whether the corporation provides fringe benefits such as pensions or profit sharing plans. Rutter v. Commissioner, 853 F.2d 1267, 1274 (5th Cir. 1988), affg. T.C. Memo. 1986-407. Ferguson participated in petitioner's profit-sharing plan and received other fringe benefits as well. This factor favors respondent.

4. Conflict of Interest

The primary issue in considering factors indicating a conflict of interest is whether some relationship exists between the company and the employees which might permit the former to disguise nondeductible corporate distributions of income as salary expenditures deductible under section 162(a)(1). Trinity Quarries, Inc. v. United States, supra at 210. The relationship in this case, where Ferguson was petitioner's majority shareholder, warrants scrutiny. Levenson & Klein, Inc. v. Commissioner, 67 T.C. 694, 711 (1977).

The corporation's dividend history is a relevant factor to consider. Petitioner paid no dividends, yet the absence of dividend payments does not necessarily lead to the conclusion that the amount of compensation is unreasonably high. Elliotts, Inc. v. Commissioner, 716 F.2d at 1246. We shall not presume a disguised dividend from the bare fact that a profitable

corporation does not pay dividends. Owensby & Kritikos, Inc. v. Commissioner, 819 F.2d 1315, 1326-1327 (5th Cir. 1987), affg. T.C. Memo. 1985-267. This is especially true in this case where petitioner's financing arrangements prohibited the payment of dividends. Furthermore, from 1979 through August 1, 1990, Wood owned a large block of petitioner's stock and also owned and operated a competitor. This may have had some impact on petitioner's dividend policy.

Courts also evaluate the compensation payments from the perspective of a hypothetical independent investor. The prime indicator is the return on investors' equity. Id. at 1326-1327. If the company's earnings on equity after payment of the compensation remain at a level that would satisfy an independent investor, there is a strong indication that management is providing compensable services and that profits are not being siphoned out of the company disguised as salary. Elliotts, Inc. v. Commissioner, supra at 1247. Respondent's expert calculated returns on equity of 27.2 percent, 20 percent, and 21.2 percent for the fiscal years ending 1990, 1991, and 1992, respectively. We conclude that an independent investor would have been satisfied with petitioner's earnings on equity during the years in issue.

Courts also consider when bonuses were paid. Payment of bonuses at the end of the fiscal year when a corporation knows its revenue for the year may enable it to disguise dividends as

compensation. <u>Owensby & Kritikos, Inc. v. Commissioner</u>, <u>supra</u> at 1329; <u>Estate of Wallace v. Commissioner</u>, 95 T.C. at 556. Petitioner's management team met with Kassouf at the end of petitioner's fiscal year to determine the annual bonuses to be paid to petitioner's executives. This factor casts some doubt on whether such payments were compensation. <u>Trinity Quarries, Inc. v. United States</u>, 679 F.2d at 211.

5. <u>Internal Consistency</u>

Internal inconsistency in petitioner's treatment of payments to employees may indicate that the payments to Ferguson were not reasonable. <u>Elliotts, Inc. v. Commissioner</u>, 716 F.2d at 1247. Petitioner had no formal program for awarding bonuses. Bonuses that have not been awarded under a formal and consistently applied program are suspect. <u>Nor-Cal Adjusters v. Commissioner</u>, 503 F.2d 359, 362 (9th Cir. 1974), affg. T.C. Memo. 1971-200. However, it is permissible to pay and deduct compensation for services performed in prior years. <u>Lucas v. Ox Fibre Brush Co.</u>, 281 U.S. 115, 119 (1930).

A. <u>Compensation for Services in Prior Years</u>

Kassouf, petitioner's accountant, testified that approximately $190,000 of the $430,000 bonus payment in 1992 consisted of "shortage amounts" due to Ferguson from the 2 prior years. The record does not support Kassouf's testimony. The bonus that Ferguson received during the fiscal year ending 1992 was for services rendered during that year.

B.  Compensation Paid to Other Employees

Petitioner paid Ferguson at the high end of the compensation range.  Petitioner presented no evidence that its other employees were compensated at or near the high end of the compensation range.  Cf. Home Interiors & Gifts, Inc. v. Commissioner, 73 T.C. 1142, 1162 (1980).  This factor favors respondent.

Based on the factors outlined above, we conclude that $650,000, $700,000, and $850,000 represent a reasonable amount of compensation to Ferguson for petitioner's fiscal years ending 1990, 1991, and 1992, respectively.

To reflect the foregoing,

Decision will be entered

under Rule 155.